UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SACCUCCI AUTO GROUP, INC., formerly known as SACCUCCI LINCOLN-MERCURY, INC., d/b/a SACCUCCI HONDA<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN HONDA MOTOR COMPANY, INC. and AMERICAN HONDA FINANCE CORPORATION d/b/a HONDA FINANCIAL SERVICES,<br><br>Defendants. | : | C.A. No. 08-121-S |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF**
**SACCUCCI AUTO GROUP, INC.'S MOTION TO COMPEL**

Plaintiff Saccucci Auto Group, Inc., formerly known as Saccucci Lincoln-Mercury, Inc., d/b/a Saccucci Honda ("Saccucci") submits this reply memorandum in further support of its Motion to Compel.

**ARGUMENT**

**I. HONDA'S DISCLOSURE OF OTHERWISE PRIVILEGED COMMUNICATIONS TO PAUL SHORTLEY WAIVED THE ATTORNEY-CLIENT PRIVILEGE**

In its opposition brief, Defendants American Honda Motor Company, Inc. and American Honda Finance Corporation d/b/a Honda Financial Services (collectively, "Honda") acknowledge that Paul Shortley is not, and was never, a Honda employee. Honda nevertheless attempts to shoe horn documents that were shared with Mr. Shortley into attorney client privilege protection by invoking an extrajurisdictional body of law that extends the attorney client

privilege to independent contractors in some circumstances. Even if First Circuit law permitted a company to disclose its privileged communications to some independent contractors – which it doesn't – the facts and circumstances of Mr. Shortley's association with Honda reveal that this was not a relationship that would justify the application of that law.

### A. Honda Overstates Shortley's Involvement In Developing The Policy At Issue

Honda attempts to characterize the relationship between Shortley/NSI as one that was so intimate that Shortley should be considered a Honda employee for the purpose of protecting communications pursuant to the attorney client privilege. Shortley is described as "as much a member of the policy development team as a Honda employee," and Honda trumpets the fact that "Mr. Shortley and NSI have been continuously engaged by Honda for approximately a decade in the area of monitoring compliance with and enforcement of Honda policies, including those related to internet advertising." Document No. 30 at 7. These statements are belied by certain undisputable facts set forth in both documents and the deposition testimony of Dan Spafford.

As an initial matter, it is simply not true that Shortley has "been continuously engaged by Honda for approximately a decade." Shortley has been employed NSI only since June of 2007. *See* http://www.thenationalsystem.com/ ("Paul Shortley, vice president of sales and business development joined NSI in June 2007.") (last visited August 6, 2008). Moreover, to characterize Shortley's involvement as akin to that of the Honda employees on the policy development team is a gross overstatement. At his deposition, Spafford was asked about the mechanics of the development of the policy. He explained that the language of the policy was developed internally, and then NSI converted it into the glossy booklet that was eventually distributed to the

dealers.[1] Spafford Dep. Tr. at 279-80 (an excerpted copy of the Deposition of Daniel P. Spafford is attached as Exhibit 1). With respect to Shortley, in particular, Spafford explained that he had never had any previous dealings with him, and that Shortley was recommended by another division of Honda. Exhibit 1 at 247. Additionally, Spafford explained that although Shortley was recommended to him early on in the development of the policy, he was not actually involved until "a bit later." Exhibit 1 at 247-48. Thus, the facts in this case reveal that Shortley was a relatively new employee of NSI, who never previously had worked with the division of Honda that developed the policy banning online VSC sales. Moreover, Shortley and NSI's "development role" consisted of merely taking an internally developed policy and transforming it into a glossy booklet with graphics.

This is reinforced by one of NSI's own internal emails, which makes clear that their role with respect to the formation of the policy was to take the policy rules as drafted by Honda's lawyers and produce a user-friendly guideline to be distributed to Honda's dealers. Shortley explained in an email to a colleague on January 31, 2008: "Since the program rules have already

[1] The following colloquy explains NSI's role in the creation of the policy banning internet sales of VSCs:

> Q Okay. I've placed before you a document marked for the purpose of this deposition as Exhibit 78. This appears to me to be a final version of the policy do you recognize it?
> A Yes.
> Q Is it in fact what it is?
> A It appears to be the latest, most recent version, yes.
> Q And this -- this is the version that was circulated to provide to all dealers, correct?
> A Correct.
> Q Can you tell me who drafted the actual language of the policy? And by who, I'm -- I'm -- I'm looking for a -- an organization. Was it -- is it Honda? Is this an outside vendor like NSI? Or other outside vendor?
> A The -- so the initial language of the policy -- the policy language, not the booklet language was formed internally. We then gave that language to NSI. NSI are the ones who actually went through and -- and adapted it to this. So they -- there are some areas where they change the lapping and we had to get approval for it. And again a lot of that based on their experience with this sort of activity.
> Q Who added the graphics?
> A That was NSI.

Exhibit 1 at 266-67.

been developed by [American Honda Financial Services], this is more about the content and flow." A copy of this email is attached as Exhibit 2. Two days later in an email that was copied to Shortley, another NSI employee wrote:

> this document was written by [American Honda Financial Services'] legal depart, hence the heavy legal feel to the document. What we would essentially like to do is keep the guidelines the way they are (after I reorganize the alpha numeric characters) and change the verbiage that explains the program and violations so that it is more reader friendly. Our fear right now is that a dealer will pick up this document, take a look at the wording and put it right back down. We would like to make it more reader friendly so that we have a higher success rate of dealers actually reviewing the document and following the guidelines.

A copy of this email is attached as Exhibit 3.

### B. <u>The Holding of *In re Bieter* Is Inapplicable To This Case</u>

Even if – contrary to the evidence – Shortley had been as substantively involved in the formation of the policy as Honda now claims, there is no basis for this Court to apply the extrajurisdictional body of law that extends the attorney client privilege to certain independent contractors that are so closely associated with an employer that they should be considered employees for the purposes of applying the privilege. *See In re Bieter*, 16 F.3d 929 (8th Cir. 1994). First, the *Bieter* rule is flatly inconsistent with the First Circuit's application of the attorney client privilege. Second, even Honda's exaggerated version of the relationship between Shortley and Honda places it outside the scope of the liberal *Bieter* interpretation of the attorney client privilege.

The First Circuit operates under the principle that the attorney client privilege shall be "narrowly confined because it hinders the courts in the search for truth." *U.S. v. Mass. Inst. Of Tech.*, 129 F.3d 681, 684-85 (1st Cir. 2001). Notably, two district courts within the First Circuit applying that principle have declined to apply *Bieter* to extend the privilege to communications shared "outside the magic circle." *See Miramar Const. Co. v Home Depot, Inc.*, 167 F. Supp. 2d

182, 185-86 (D.P.R. 2001); *Crowley v. L.L. Bean, Inc.*, No. CIV. 00-183-PC, 2001 WL 103541, at *1-*3 (D.Me. Feb. 1, 2001). In *Miramar Const.*, communications with an independent contractor that was on site with the employer, worked under the direct supervision of a project manager for the employer, and was performing "sensitive and confidential services" for the employer were held to be outside the scope of the privilege. 167 F. Supp. 2d at 185. Similarly, in *Crowley*, a social worker who was regularly utilized by the employer to perform two specific functions was held to be a person outside the circle of people among whom communications are privileged. 2001 WL 103541 at *3. Thus, courts that have considered whether the First Circuit would be willing to expand the scope of the attorney client privilege to communications shared with non-employees, as the *Bieter* court did, have elected not to do so.

In stark contrast to both the individuals in *Miramar Const.* and *Crowley*, as well as Mr. Shortley in this case, stands the independent contractor in *Bieter*. That case involved a partnership formed solely for the purpose of developing a certain plat of land. 16 F.3d at 933. That partnership had two members, one of whom resided out of state. *Id.* The other member of the partnership shared office space with the independent contractor in question and was a partner with that independent contractor in another venture. *Id.* Initially, there was a formal contractual relationship between the independent contractor and the partnership that lasted one year. *Id.* at 933-34. At the conclusion of that contractual relationship, a period of three years elapsed in which there was no formal business relationship between the independent contractor and the partnership, but the independent contractor continued to perform the same functions as he had during the term of the contract. *Id.* at 934. Thereafter, the independent contractor became a formal employee of the partnership. *Id.*

Throughout this time, the independent contractor was inextricably intertwined with all of the business of the partnership, namely, developing a shopping center. *Id.* He served as the partnership's sole representative at certain meetings and was tasked as the sole individual responsible for many of the steps in the development process that eventually became the subject of litigation. *Id.* It was on this basis that the Eighth Circuit determined that during his time as an independent contractor that he was the functional equivalent of an employee such that communicating legal advice to him was essential for the partnership. *Id.* at 938

Shortley's involvement in the development of the policy banning internet VSC sales, as explained, *supra*, was far less vital and extensive. Whereas the independent contractor in *Bieter* had full responsibility for certain parts of the business of the partnership that became the subject of litigation, Shortley and NSI merely served as publishers of the policy. Even if Honda's version of events were correct and Shortley offered input on the internally developed policy, that was not his principal role. By Honda's own admission, Shortley and NSI were to serve, primarily, as the enforcement arm of the policy, once it was promulgated. Affidavit of Carol J. Moore, Esq., Docket No. 32, at ¶¶ 6-7, 10. This role is a far cry from the sort of intimate and extensive involvement with the company's operations that characterize the cases, such as *Bieter*, in which some courts outside the First Circuit have extended the privilege to cover independent contractors.

The independent contractor in *Bieter* was an individual that worked for the partnership in a capacity similar to that of an employee, performing functions that might be performed by an employee. Shortley is an employee of NSI. Honda hired NSI and Shortley to perform a function separate and apart from the usual business of Honda. Shortley, therefore, is not an independent contractor in the sense that the *Bieter* court was discussing. Honda's use of Shortley and NSI in

the publication and enforcement function Honda envisioned is much more akin to the relationship of a company that hires a public relations firm to help sell a product. *See Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) (declining to apply privilege to communications shared with a public relations firm). In *Wachner*, the role of the public relations firm was to spin the litigation in a way that would secure public favor, similar to Shortley/NSI's role of packaging the policy to make it palatable to dealers who sold VSCs online. *Id.* at 54-55. If every time a company looked to an outside company to perform functions beyond the normal scope of the company's business the attorney-client privilege protected communications shared with that outside company, then the rule that the privilege is destroyed upon disclosure would be crippled and the rule that the privilege is to be narrowly construed would be directly contradicted. *See Mass. Inst. Of Tech.*, 129 F.3d at 684-85. Accordingly, communications shared with Paul Shortley by Honda simply cannot be protected by the attorney client privilege.

## II. AN *IN CAMERA* REVIEW OF ALL THE DOCUMENTS LISTED ON THE PRIVILEGE LOG PRODUCED BY HONDA IS APPROPRIATE

Saccucci seeks *in camera* review of the documents listed on Honda's privilege log because the positions taken by Honda in this litigation suggest either a deliberate strategy to impede Saccucci's discovery, or a fundamental misunderstanding by Honda of the rules of privilege. In its opening brief, Saccucci pointed to several examples of Honda's discovery conduct that gave rise to and justify Saccucci's very real concerns. In its opposition brief, however, Honda argues that *in camera* review is inappropriate because Saccucci did not meet and confer with Honda regarding each document listed on the privilege log. This argument is neither accurate nor relevant to the issue that led Saccucci to seek *in camera* review in the first place. As is evidenced by Exhibit A to the Affidavit of David A. Kluft, Esq., Document No. 31-

3, submitted by Honda in connection with its opposition to the motion to compel, Saccucci has repeatedly addressed issues with Honda's discovery responses and privilege log in telephone calls and e-mails. As is plain from the manner in which Honda has responded to the issues raised by Saccucci, Honda's tactic has been to frustrate Saccucci by withholding relevant, discoverable evidence.

Honda's tactic of frustration is most clearly evident in the example of the email between two Honda employees, neither of whom was a lawyer, that Honda redacted because it was not aware that Saccucci already had been forwarded the full, unredacted version of the email by a Honda employee. See Document 29 at 9-10 (comparing in detail the emails attached as Exs. 5 and 6). Remarkably, in its opposition brief, Honda maintains that the clearly non-privileged material was properly redacted and claims it was produced only because Saccucci already was in possession of the email. Either Honda truly believes that its obviously improper redactions were proper or it is disingenuously defending the improper redactions in order to save face. Either way, Honda's actions highlight the necessity of an *in camera* review.

Honda's discovery tactics are further demonstrated by its "reconsideration" of the privileged nature of several e-mails on which Shortley was copied. Despite the fact that the parties met and conferred regarding the Shortley emails on more than one occasion, Honda unequivocally refused to produce them. After this motion to compel was filed, however, Honda decided that maybe these documents weren't so privileged after all and produced some of them. Document No. 30 at 6 n.4. Saccucci gave Honda ample opportunity to resolve this discovery dispute. Weeks passed between the time that Saccucci initially inquired as to why these e-mails had been withheld on the basis of privilege and the time that Honda communicated that it maintained that they were privileged and would not produce them. Until Saccucci involved the

Court, Honda simply stuck to its position, despite the fact that its own review of the e-mails obviously revealed that at least some of them are not privileged. *See* Document No. 30 at 6 n.4.

Honda's discovery machinations also are evidenced by Honda's argument in response to Saccucci's motion to compel a response to Request for Production No. 12. Honda acknowledges in its opposition brief that, after meeting and conferring with Saccucci, Honda understood exactly what Saccucci was seeking in the request and acknowledges the discoverability of that information, but justifies its refusal to respond on the grounds that Honda demanded that Saccucci reword and then resubmit the discovery request.[2] This is not how discovery works. The Federal Rules of Civil Procedure do not entitle Honda to respond only to discovery requests worded in a manner Honda deems appropriate – they require Honda to respond fully to all discovery requests seeking relevant information. Fed. R. Civ. P. 26. Once Honda understood that relevant information was sought, it had an affirmative obligation to respond. Instead, it engaged in gamesmanship.

Discovery in this case is subject to a short window; the preliminary injunction hearing, originally scheduled for July 28, 2008 is now scheduled to begin August 25, 2008. Honda has clearly established a track record of inappropriately redacting and withholding documents that should have been neither redacted nor withheld, treating the meet and confer requirement as simply another opportunity to restate its objections and producing documents in response to a motion to compel that it refused to produce after meeting and conferring with Saccucci. In a case not involving the compressed preliminary injunction time frame, Saccucci certainly would endeavor to take additional discovery, depose witnesses, have additional meetings and

[2] It is noteworthy that now, in response to the motion to compel, Honda has responded to the request, stating affirmatively that it has not withheld any documents on the basis of its objection. Saccucci informed Honda that it sought either responsive documents or an affirmative statement that no responsive documents exist. In light of Honda's admission that it has not withheld any documents on the basis of its objection, Saccucci considers this dispute resolved, as Honda's admission is the equivalent of a statement that no responsive documents exist.

conferences with Honda and otherwise more thoroughly probe the integrity of Honda's privilege log. In this case, there is simply not enough time to do so in advance of the hearing. It is the nature of the privilege log, generally, that the substance of the withheld documents is not apparent to the requesting party. Given the circumstances of this case and the serious doubts about Honda's commitment to honoring its discovery obligations, an *in camera* review of the documents is the most efficient, effective and fair way to assure a level playing field.

## III. HONDA'S OBJECTION TO DOCUMENT REQUEST NUMBER 11 IS UNAVAILING

Saccucci's Document Request No. 11, seeking documents relating to requests for advance written permission to reference Honda Care and Acura Care on the internet, was posed largely because Honda responded to Saccucci's Motion for Temporary Restraining Order with an affidavit by Daniel Spafford in which Mr. Spafford not only highlighted a contractual requirement that he claimed required dealers to obtain such advance written permission, but also suggested that Saccucci had violated the terms of a contract by failing to obtain such permission. Affidavit of Daniel P. Spafford, at ¶ 3. Despite having placed this contractual provision at issue, Honda refused to produce any responsive documents. In its opposition brief Honda seeks to justify this refusal through inaccurate and irrelevant speculation as to Honda's planned use of the documents.

Specifically, Honda surmises that Saccucci seeks to show that Honda has waived the right to assert the contractual term that written permission is required to reference Honda Care on the internet, and argues that only the conduct as between Saccucci and Honda is relevant to such an argument – thereby obviating the need to discover whether other dealers ever sought and/or obtained such written permission. This argument is inapposite. For one thing, as Daniel Spafford admitted in his deposition, Saccucci was not a party to the version of the contract that

contained the language requiring advance written permission in order to reference Honda Care or Acura Care on the internet or world wide web. Exhibit 1, at 282. So, Honda's speculation as to a "waiver" theory is a red herring. Saccucci would never argue that Honda waived a contractual right vis-à-vis Saccucci that Honda acknowledges it did not have.

The principal issue for the preliminary injunction hearing is whether Honda had a right to implement a policy banning online sales of VSCs, and whether, if it did, the policy was coercive, arbitrary or predatory. Whether Honda policed the internet activity and enforced internet-related contract rights it may have had with some other dealers is most certainly relevant to and instructive regarding Honda's decision to ban sales altogether, its motivation for the ban and whether that ban was coercive, arbitrary or predatory as to Saccucci. As such, this information is discoverable. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 596-97 (1st Cir. 1980) ("It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence") (quoting Fed. R. Civ. P. 26).

**CONCLUSION**

For the reasons stated in this reply memorandum, as well as those presented in its initial memorandum of law in support of its motion to compel, Saccucci respectfully requests that this Court grant its motion to compel.

Dated: Providence, Rhode Island
August 11, 2008

PLAINTIFFS, SACCUCCI AUTO GROUP, INC., formerly known as SACCUCCI LINCOLN-MERCURY, INC., d/b/a/ SACCUCCI HONDA
By its attorneys,

*/s/ Adam M. Ramos*

John Tarantino, #2586
Geoffrey W. Millsom, #6483
Adam M. Ramos, #7591
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-2443
Tel: (401) 274-7200
Fax: (401) 351-4607

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing Motion to Compel and memorandum of law in support thereof through the ECF system on the 20th day of June, 2008, and that notice will be sent electronically to all counsel who are registered participants identified on the Mailing Information for Case C.A. No. 08-121-S and by regular mail, postage pre-paid, to:

Michael B. Keating, Esq.
David A Kluft, Esq.
Catherine Wicker, Esq.
Foley Hoag, LLP
155 Seaport Blvd
Boston, MA 02210.

*/s/ Adam M. Ramos*

*463817_2.doc*