UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SACCUCCI AUTO GROUP, INC., formerly known as SACCUCCI LINCOLN-MERCURY, INC., d/b/a SACCUCCI HONDA,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN HONDA MOTOR COMPANY, INC. and AMERICAN HONDA FINANCE CORPORATION d/b/a HONDA FINANCIAL SERVICES,<br><br>Defendants. | C.A. No. 08-121-S |

**DEFENDANTS' PRETRIAL MEMORANDUM**

Defendants American Honda Motor Co. Inc. ("AHM") and American Honda Finance Corporation ("AHFC") (collectively "Defendants" or "Honda") submit this pretrial memorandum in the above-referenced matter.

On February 14, 2008, Honda announced a nation-wide policy that would prohibit Honda and Acura dealers from selling Honda Care and Acura Care brand Vehicle Service Contracts ("Honda Care VSCs") over the internet, effective on April 1, 2008.[1] A VSC is essentially an extended warranty for an automobile. Plaintiff Saccucci Auto Group, Inc. ("Saccucci"), a Honda dealer who sold Honda Care VSCs over the internet, claims that the announced policy is a

[1] For the sake of simplicity, this brief will refer to "Honda Care" only throughout. Unless otherwise noted, what is stated herein also applies to the "Acura Care" brand.

violation of Rhode Island General Laws, § 31-5.1-1 et seq. Saccucci has also brought claims for promissory estoppel and breach of the covenant of good faith and fair dealing.

## FACTS

The Honda Care VSC is an insurance product akin to an extended warranty, which provides vehicle owners with a range of benefits, including repair services, comprehensive component coverage, rental car reimbursement and roadside assistance. Although Honda Care VSCs are sold by Honda dealers, each VSC is a contract between the customer and Honda, not between the customer and the dealer. The dealer charges the customer for the VSC, pays over to Honda an amount reflecting the cost of the VSC, and retains whatever is left as profit. Honda does not set the price at which dealers sell VSCs to customers -- Honda makes the same amount of money on a VSC regardless of the price the customer pays to the dealer.

The market for VSC sales is highly competitive. There are many third-party providers of VSC products, including major players such as JM&A Group, Automobile Protection Corporation and General Electric Money Warranty Services. For business reasons, many dealers choose to offer and promote competing products in addition to or instead of Honda Care VSCs. For example, Saccucci currently offers General Electric as well as Honda Care.

### Honda's Contractual Relationship with Dealers

Honda's contractual relationship with its dealers vis-à-vis the sale of VSCs is governed principally by an Automobile Dealer Sales and Service Agreement ("Dealer Agreement"), which defines "Honda Products" to include service contracts (¶24.16)[2] and grants the dealer the non-

[2] The Dealer Agreement, which was part of the record before the Superior Court, has been bates stamped HONDA00826 - 00874 and will be a trial exhibit.

exclusive right to sell said products. (¶16.2).[3] Under the Dealer Agreement, Honda dealers are required to make the Honda Care product available if a customer requests it. However, dealers are otherwise under no obligation to encourage customers to purchase Honda Care VSCs or even to mention their existence. A dealer may choose to promote a competing product instead. VSCs are in this regard different from other Honda Products, as is recognized by the Dealer Agreement, which provides:

> [I]t is the obligation of Dealer to effectively promote and sell at retail to the end user, Honda Products (*with the exception of Honda-authorized service contracts*, as set forth below) . . . Dealer shall offer Honda-authorized service contracts for sale to customers, such that they are available for purchase *upon a customer's request*.

(¶ 12.1) (emphasis added). Although a dealer is not required to promote Honda Care, many do, and the Dealer Agreement retains in Honda the right to control the way in which they market Honda's products. Paragraph 12.9 of the Dealer Agreement provides that:

> "American Honda and Dealer recognize that it may be necessary for American Honda to formulate new or different marketing strategies, directives and Policies and Procedures to meet new or changing technology, laws or circumstances. In the operation of Dealer's business and in the sale and promotion of Honda Products, in rendering service and in all other activities of the Dealership Operations, Dealer will follow all reasonable directives and suggestions, and the Policies and Procedures."

**The Value of Honda Care to Honda, the Dealer and the Customer**

Honda entered the VSC market in approximately 1993 for two principal reasons. First, independent service contract providers were going out of business, leaving Honda customers with uncovered claims that Honda often paid in order to maintain customer satisfaction. Second, based on its experience with a similar product offered for motorcycles, Honda felt that

---

[3] Dealers also enter into an Enrollment and Participation Agreement ("Enrollment Agreement"), which reiterates some aspects of the Dealer Agreement and under which the dealer agrees to service automobiles protected by Honda Care VSCs in return for compensation from Honda.

establishing an authorized Honda VSC would increase service retention (i.e. customers returning to Honda dealers for service).

Honda and its dealers can realize tremendous mutual benefits from a healthy Honda Care program. A Honda Care customer will most likely return to a Honda dealer for repairs and because only genuine Honda parts will be used, the Honda Care-covered vehicle will perform better. The customer will likely come to trust the dealer and remain loyal to the brand when it is time to purchase a new vehicle. These benefits are consistent with the Dealer Agreement's Statement of Philosophy that:

> Honda is committed to creating vehicles of the highest quality to provide Honda customers with an ownership experience so rewarding that they remain customers for life . . . The ultimate goal of the shared responsibilities outlined in this Dealer Agreement is the complete satisfaction of the Honda customer.

In order for the benefits of Honda Care to be realized, however, Honda dealers must actively promote the product to their customers at the time a vehicle is being sold. The VSC is a sales-oriented product, which many customers may not think to ask for on their own. It is more likely to be sold after the product has been introduced by a sales person in a face to face conversation. During such a conversation, the customer can be sold on the value of purchasing a VSC to protect the investment she is making in the automobile, and the Honda Care VSC can be effectively differentiated from its competitors.

In order to encourage dealers to promote the product at the point of sale and to prioritize the sale of Honda Care VSCs over competitive products, Honda offers the dealer a further financial incentive beyond the profit the dealer makes on each VSC sale. This is called a Performance Based Allowance incentive ("PBA"), which is a quarterly cash payment based on a quotient that measures the number of the dealer's sales of VSCs in comparison with its sales of

automobiles during the same period. Dealers who receive PBA payments enter into a separate agreement with Honda, which provides that:

> Dealer understands and agrees that neither Dealer's agreement to participate in the PBA Program nor its actual participation creates any expectation that AHFC will maintain the PBA Program. Dealer agrees that it will make no investment or take any other action in reliance on the future existence of the PBA Program . . .

**The Internet Sale of VSCs**

During the last several years, a small number of dealers (approximately a dozen out of over 1,200 nation-wide) began selling VSCs on websites, on eBay and in chat rooms at high volumes. Honda did not discourage this practice until it became apparent that these internet sales threatened customer relations.

As described to Honda by many of its dealers, the kind of problem caused by internet sales is illustrated as follows: a customer in Illinois walks into her local Honda dealership and purchases an automobile. At the time of sale, the dealer takes the time to introduce the Honda Care VSC product to the customer. The price offered, for example, is cost plus a $400 profit.[4] The customer either purchases the product or resolves to do so at a later time. Subsequently, the customer learns that a dealership in another state is selling the same product on-line for approximately $400 less. The customer, who now believes that her local dealership has attempted to "rip her off," cancels the VSC purchased from the Illinois dealer, and repurchases it on-line from the internet dealer. Not only does the dealer lose the sale but, more importantly, the dealer's relationship with that customer is damaged. Honda and its dealers believe that when a customer has this kind of bad experience with the brand, she is less likely to return to the local dealer for service and less likely to purchase another Honda in the future. Honda dealers look for

[4] Many dealers charge more than this, reflecting overhead and other costs associated with an "in-store" sale as well as what the dealer believes the market will bear.

life-long relationships with customers and they cannot afford to lose future business in this way. Some dealers, unable to sustain this loss of good will, have decided to avoid the problem in the future by promoting a competing product instead of Honda Care.

**The Evolution of Honda's Policy**

From time to time since approximately 2003, Honda would receive a complaint from an individual Honda dealer who had lost a VSC sale to an internet dealer. However, Honda thought the dealers were complaining only about being undersold or losing a particular sale, which is a normal part of the business. Honda's understanding changed in 2007. In January and again during the summer of 2007, the Honda Dealer Advisory Board ("DAB"), a representative body of Honda dealers, which gathers complaints and recommendations from Honda dealers to present to Honda management, advised Honda that the internet sale of VSCs was a major concern because of its effect on customer relations. Honda is responsive to recommendations of the DAB because Honda's dealer network is the heart of Honda's business, and the dealers are the main liaison with the Honda customer. Moreover, in its Dealer Agreement, Honda agrees to consult with the DAB as is reasonably practical about important policy changes.

Additionally, in September of 2007, several members of Honda management spoke to a dealer in Illinois, the owner of Muller Honda, who explained in no uncertain terms the effects of internet sales of VSCs on brand image and customer satisfaction at his dealership. Muller Honda had experienced an angry customer who had purchased a VSC on line after purchasing one for more money at Muller Honda. Mr. Muller told Honda that "[t]he issue is not about the bottom line, the revenue from lost sales is irrelevant, it's about image and reputation, and unhappy customers." Mr. Muller also explained that he intended to abandon the promotion of Honda

Care VSCs in order to avoid this problem going forward. Mr. Muller did later abandon promotion of Honda Care, and now promotes the General Electric product instead.

After the DAB had raised its concerns, Honda began to evaluate and study the issue. In the Fall of 2007, around the time Honda spoke with Mr. Muller, Honda pulled together a policy team. This team was coordinated by Dan Spafford, the manager in charge of Honda Care, and consisted of Honda management, Honda attorneys and outside consultants and counsel. Initially the team did not consider banning internet sales, hoping that there could be other solutions. However, among the items considered by the team was Honda's Power Equipment Internet policy. That policy was also developed in response to a similar brand image situation in which internet sellers of Honda generators were "free-riding," that is, taking sales away from in-store dealers who had spent time with the customers explaining the product. The Power Equipment policy thus prohibits internet sales by individual dealers and establishes rules for on-line marketing.

Ultimately, the team decided to implement a policy modeled to some extent on the Power Equipment policy, in that it prohibited internet sales of Honda Care VSCs and also established on-line marketing rules. Dealers who violate the policy are NOT subject to franchise termination, but lose only the license to sell Honda Care VSCs. The policy was announced in February, 2008, and was scheduled to go into effect on April 1, 2008. With few exceptions other than Saccucci, the announced policy was supported by other Honda dealers.

Honda understands the importance of the internet, and the policy was not designed as a permanent solution. Honda believes, however, that in the absence of this policy more and more customers will feel cheated by their local dealers and more dealers may abandon promotion of the Honda Care product to avoid that result. Until such a time as it can develop a more

comprehensive strategy to take advantage of internet technology without endangering the brand, it is Honda's business judgment that this policy was a prudent measure.

**Saccucci's Internet Sales Business**

Saccucci is a family-owned dealership of Honda and Lincoln Mercury vehicles located in Rhode Island. Gardiner Reynolds ("Reynolds"), a family member who graduated from college in 2003, launched a successful on-line parts and accessories business for Saccucci shortly after he began working there. In approximately 2005 Reynolds noticed that a few other Honda dealers were selling Honda Care VSCs online, and began to research the business. After deciding to sell VSCs on-line at Saccucci, Reynolds mentioned his plan to Robert Wilkinson ("Wilkinson"), the Honda sales representative assigned to Saccucci. Wilkinson knew that there was no policy at the time prohibiting internet sales, and aware that other dealers in his district were making sales of VSCs that way, did not discourage Reynolds from also selling VSCs on line.

In early to mid 2006, Saccucci entered the internet sales market. Mr. Reynolds proved to be an effective salesman, and competed aggressively with other on-line dealers and with dealers who sold "in-store." Reynolds' business strategy was to sell VSCs on line at little or no profit, thus entitling Saccucci to large PBA payments. Interestingly, in contrast to the prices it offered on-line customers, Saccucci continued to charge its in-store Rhode Island customers more typical mark-ups of several hundred dollars per VSC.

When Honda announced its policy, Saccucci moved to protect its internet revenue stream. A Rhode Island Superior Court judge issued a temporary restraining order prohibiting the policy from being applied to Saccucci. Honda removed the matter to this Court and voluntarily suspended the policy nationwide in order to avoid giving Saccucci an on-line monopoly.

## ARGUMENT

The Court "must weigh four factors in determining whether to issue a preliminary injunction: (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. Wine and Spirits Retailers, Inc. v. Rhode Island, 418 F. 3d 36, 46 (1st Cir. 2005). To the extent that a preliminary injunction hearing is consolidated with a hearing on the merits of a permanent injunction, "the standard of review is essentially the same except that the movant must show actual success on the merits rather than a mere likelihood." Diva's, Inc. v. City of Bangor, 21 F. Supp. 2d 60, 63 (D. Me. 1998).

### The Rhode Island Automobile Dealers' Law

Rhode Island General Law, § 31-5.1-1 et seq., otherwise know as the Rhode Island "Dealers' Law," regulates the relationship between automobile dealers and automobile manufacturers, and is often construed by reference to similar statutes in other states and to its federal counterpart, the Automobile Dealers' Day in Court Act, 15 U.S.C.S. § 1221 et seq. ("ADDC"). See Dunne Leases Cars & Trucks, Inc. v. Kenworth Truck Co., 466 A. 2d 1153, 1157-1160 (R.I. 1983). These statutes were enacted in response to a disparity of bargaining power between dealers and a small number of manufacturers who "with few exceptions [are] completely dependent on the manufacturer for their supply of cars." New Motor Vehicle Board of California v. Orrin W. Fox Co., 439 U.S. 96, 102 (1978) (citing S. Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956)); Dunne, 466 A. 2d at 1158. ("Franchise-protection statutes are intended to rectify 'grossly disproportionate bargaining power'"). The protection of the statute is vital "[i]n

the context of automobile allocation, where the manufacturer possesses all of the goods *ab initio* . . ." Pride Hyundai, Inv. v. Chrysler Financial Co., LLC, 263 F. Supp. 2d 374, 397 n. 42 (D. R.I. 2003). However, where there are "many more market players and therefore less inherent likelihood of inequitable or coercive conduct," application of the statute is less likely to give effect to its legislative intent. Id. (comparing automobile sales to dealership financing).

Dealers' Laws are "not meant to subvert a manufacturer's business judgment of what is good for both parties." Volkswagen Interamericana, S.A. v. Rohlsen, 360 F. 2d 437, 442 (1st Cir. 1966). A "[f]ranchise is not a marriage for life," and dealer laws do not prohibit the manufacturer from taking measures against "a dealer who is not providing the manufacturer with adequate representation or who refuses to carry out its legitimate marketing policies." Burgin Motor Company, Inc. v. American Motor Sales Corp., 449 F. Supp. 842, 850 (D. S.C. 1978) (quoting McGeorge Car Company, Inc. v. Leyland Motor Sales, Inc., 504 F. 2d 52, 55-56 (4th Cir. 1974)). For this reason, this Court has noted that the Rhode Island Dealers' Law "recognizes that a manufacturer should have the ability to insist upon compliance with its reasonable standards without subjecting itself to reflexive accusations of coercion or bad faith." Scuncio Motors, Inc. v. Subaru of New England, Inc. 555 F. Supp. 1121, 1132-3 (D.R.I. 1982), aff'd, 715 F.2d 10 (1st Cir. 1983).

*"Arbitrary, in bad faith or unconscionable"*

Saccucci claims that Honda's new policy is "arbitrary, in bad faith, or unconscionable" in violation of R.I. Gen. Law, § 31-5.1-4 (a). The First Circuit, in construing identical language under the Maine Dealers' law, has defined "arbitrary" as "selected at random and without reason" and "unconscionable" as "shockingly unfair or unjust." Schott Motorcycle Supply Inv. v. American Honda Motor Co., 976 F. 2d 58, 63 (1st Cir. 1992) (citing Webster's New Collegiate

Dictionary).[5] As with the Maine statute, the Rhode Island Dealer's Law does not define "bad faith," but it defines "good faith" as "honesty in fact and the observation of reasonable commercial standards of fair dealing in the trade." Id.; see also R.I. Gen. Law, § 31-5.1-1(H); Scuncio Motors, 555 F. Supp. at 1132. Therefore, a "party presumably acts in bad faith when one of these two elements is missing." Id.

In Coady Corp. v. Toyota Motor Dist. Inc., 361 F. 3d 50, 55-57 (1st Cir. 2004), the First Circuit interpreted similar language in the Massachusetts Dealers' Act to have the same essential components, that is, honesty in fact and commercial reasonableness. The Court emphasized that the statute did "not demand perfection . . . or warrant a substitution of judicial for business judgment." Id. at 56. Rather, a manufacturer "acting honestly is entitled to latitude in making commercial judgments" and "it is only the egregious decision that should be labeled 'arbitrary' or 'unfair.'" Id. The Court further noted that "reasonable does not mean foolproof" or "without wrinkles," and that honest decisions by manufacturers would not be found to violate the statute when they had a "plausible business rationale." Id. at 56-58.

*"Predatory"*

Saccucci also accuses Honda of a "predatory practice against a new motor vehicle dealer" pursuant to R.I. Gen. Law, § 31-5.1-4 (c)(21). Defendants have been unable to locate a definition of "predatory" for purposes of the Dealers' Law. Case law in this District suggests that any practice that is not found to be in bad faith under the act can not be predatory. Scuncio Motors, 555 F. Supp. at 1138 n. 27. "Predatory pricing" is traditionally defined as "[u]nlawful

---

[5] In Schott, there was no Maine case law offering an alternative interpretation of these terms in the context of the Dealers' Law, which appears to be the case in Rhode Island as well.

below-cost pricing intended to eliminate specific competitors and reduce overall compensation," an act of which Honda is not accused. See Black's Law Dictionary 1196 (7th ed. 1999).

To the extent that this Court deems "predatory" to have a more general meaning under antitrust principles, Honda notes that the present circumstances are similar to those found not to violate the Sherman Act. In Lovett v. General Motors Corp., 998 F. 2d 575, 577 (8th Cir. 1993), the plaintiff dealer began a regional advertising campaign in which it set out to undersell other dealers and make up the money in volume. The plaintiff ordered the cars from the manufacturer on a "sold order" basis, i.e. only once the customer ordered the car. Consequently, the plaintiff did not have to invest in inventory (as with VSCs). Id. Customers were going to other dealers have the brand sold to them, but then ordering their vehicle from the plaintiff by mail and phone. Id. This "strategy allowed [the plaintiff] to avoid an increase in [] overhead costs proportionate to its increase in sales." Id. at 581.

The manufacturer attempted to stop this practice by cutting off the plaintiff's ability to make high volume "sold order" sales. Id. at 577. The Court held that:

> [A] manufacturer may have its own valid business reasons for taking the adverse action. A manufacturer often wants to ensure its dealers earn enough profit to pay for services and promotional activities that are necessary to market the manufacturer's product efficiently. Manufacturers also have an interest in preventing "free riding." A free rider problem may arise when a manufacturer's dealers offer presale, point-of-sale, or post-sale services. Price-cutting dealers are often able to sell at lower prices by avoiding the cost of providing these services. Customers can take advantage of the services provided by dealers who do not cut their prices, but purchase the product from the price-cutting dealer. Thus, the dealers who do not cut their prices perform essential services without benefitting from sales. Free riding is a great concern in the automobile industry because service and repair are vital. The availability and quality of service and repair affect a manufacturer's goodwill and the competitiveness of the manufacturer's product. Accordingly, a manufacturer can take action against a price-cutting dealer without fear of antitrust liability if the action is the product of the manufacturer's independent decision that the price-cutting dealer undermines the well-being of the manufacturer's dealer network, even though the manufacturer learns

about the price-cutting dealer's behavior from dealers "whose principal or perhaps only concern is with protecting their prices."

Id. at 578 (citations omitted).

*"Coercion"*

Saccucci contends that Honda's internet policy is "coercive" under R.I. Gen. Law, § 31-5.1-4 (b)(4), (b)(5) and (c)(2).[6] The Rhode Island Supreme Court has looked to federal court interpretations of the ADDC to define coercion as "'a wrongful demand which will result in sanctions if not complied with.'" Dunne, 466 A. 2d at 1160 (citing Marquis v. Chrysler Corp., 577 F.2d 624, 633 (9th Cir. 1978)). Coercion is found where a manufacturer attempts to impose "conditions which benefit only, or primarily, the manufacturer . . . as distinguished from requirements that would tend to work to the mutual advantage of both parties." George Lussier Enterprises, Inc. v. Subaru of New England, Inc., 393 F. 3d 36, 45 (1st Cir. 2004).

It is not "coercive" for a manufacturer to demand adherence to "reasonable standards" and to the "reasonable terms or provisions of the franchise agreement." Scuncio Motors, 555 F. Supp. at 1133, 1137. Rather, "coercion" typically involves a dealer that is singled out for discriminatory treatment, usually coupled with an ulterior motive of the manufacturer. Compare Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F. 2d 564, 575-576 (3rd Cir. 1986) (wrongful attempt by manufacturer to force one dealer out of the market by discriminatory vehicle allocation), with, Burgin, 449 F. Supp. at 852 (uniform enforcement of nationwide policy not wrongful); see also Action Nissan Inc. v. Nissan, 454 F. Supp. 2d 108, 118 (S.D.N.Y. 2006)

---

[6] One of the subsections cited by Saccucci prohibits a manufacturer from coercing a dealer "[t]o refrain from participation in the management of, investment in, or acquisition of any other line of new motor vehicle or related products." R.I. Gen. Laws § 31-5.1-4 (b)(5). This subsection does not appear to apply to the present fact pattern. However, any disagreement over this point does not effect the definition of "coercion."

("If the manufacturer has an objectively valid reason for its actions, the plaintiff cannot prevail without evidence of an ulterior motive").

As will be clear from the evidence presented in this matter, the decision of Honda to ban internet sales of Honda Care VSCs was not in bad faith, arbitrary or unconscionable, nor was it coercive or predatory. Rather, it was based on a good faith business judgment by Honda that the continued practice of internet sales was jeopardizing Honda's relationship with its customers and was damaging the Honda brand. The decision was based upon successive concerns brought to the attention of Honda management by the DAB, and the policy adopted is a national policy -- not directed at any individual dealer. For this Court to invalidate such a policy, adopted honestly and with commercial reasonableness, would be contrary to controlling authority. Moreover, Honda's right to make such modifications to its marketing strategies is specifically reserved to Honda in Paragraph 12.9 of the Dealer Agreement cited on page 3 above.

**Saccucci's Common Law Claims**

Saccucci has also brought a claim for promissory estoppel, to prevail on which it must demonstrate (1) a clear and unambiguous promise; (2) reasonable and justifiable reliance upon the promise; and (3) detriment to the promissee, caused by its reliance on the promise. Filippi v. Filippi, 818 A. 2d 608, 625-6 (R.I. 2003); Siesta Sol, LLC v. Brooks Pharmacy, Inc., 2007 WL 2377044 at *13 (D. R.I. 2007). None of these factors are present in this case. While Honda permitted VSC internet sales at one time, there is no evidence that Honda ever represented to Saccucci that it could continue to do so for the indefinite future.

Sufficient clarity requires not just an unambiguous statement inducing the Plaintiff to act, but enough detail to apprise plaintiff of the terms of the deal. Filippi, 818 A. 2d at 626; see also DellaGrotta v. Dellagrotta, 873 A. 2d 101, 110 (R.I. 2005) (promise not sufficiently clear where

time frame and amount of money involved were not discussed). Additionally, where the parties' relationship is subject to a writing specifying which individuals may make binding promises, and the alleged promisor is not among them, reliance on such a promise will not be considered reasonable. See Mangla v. Brown University, 135 F. 3d 80, 83 (1st Cir. 1998).[7]

Saccucci also claims that Honda has breached the implied covenant of good faith and fair dealing, which requires Saccucci to show that Honda somehow "crossed the line from hard bargaining to oppressive, bad faith, or opportunistic behavior" such that the parties' dealings were not "free from arbitrary or unreasonable conduct". Pride Hyundai, 263 F. Sup. 2d at 394. This claim appears to be derivative of Saccucci's claims under the Dealers' Law.[8]

AMERICAN HONDA MOTOR
COMPANY, INC. AND AMERICAN
HONDA FINANCE CORPORATION

By their attorneys,

/s/ Gordon P. Cleary
Gordon P. Cleary (No. 1948)
VETTER & WHITE
20 Washington Place
Providence, Rhode Island 02903
401-421-3060
401-272-6803(fax)

____________________
Michael B. Keating (MA. BBO #263360)
David A. Kluft (MA BBO #658970)
Catherine H. Wicker (MA BBO #664326)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000
(617) 832-7000 (fax)

Dated: August 19, 2008

[7] Additionally, in Schott Motorcycle Supply Inv. v. American Honda Motor Co., 976 F. 2d 58 (1st Cir. 1992), a dealer complained that he made certain business decisions based on general verbal statements by Honda representatives that Honda intended to remain committed to a certain business. Id. at 59-60. The Court ruled against the dealer on other grounds, but noted in dicta that such representations "seem scarcely sufficient to form the basis for a valid oral contract." Id. at 62 n. 1.

[8] Honda has asserted affirmative defenses in equity, which it does not waive.

CERTIFICATE OF SERVICE

To: Geoff Millsom
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-2443

I hereby certify that I served the foregoing through the ECF system on August 19, 2008, and that notice will be sent electronically to all counsel who are registered participants identified on the Mailing Information for Case C.A. No. 08-121-S and by first class mail, postage pre-paid, to non-registered parties.

/s/ Gordon P. Cleary