UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SACCUCCI AUTO GROUP, INC., formerly known as SACCUCCI LINCOLN-MERCURY, INC., d/b/a SACCUCCI HONDA<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN HONDA MOTOR COMPANY, INC. and AMERICAN HONDA FINANCE CORPORATION d/b/a HONDA FINANCIAL SERVICES,<br><br>Defendants. | : | C.A. No. 08-121-S |

**PLAINTIFF SACCUCCI AUTO GROUP, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR A PRELIMINARY INJUNCTION**

Geoffrey W. Millsom, #6483
Jeffrey K. Techentin, #6651
Adam M. Ramos, #7591
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel.: (401) 274-7200
Fax: (401) 751-0604

Attorneys for Plaintiff Saccucci Auto Group, Inc.

Plaintiff Saccucci Auto Group, Inc. ("Saccucci") respectfully submits this memorandum of law in support of its motion for a preliminary injunction against defendants American Honda Motor Company, Inc. ("Honda Motor") and American Honda Finance Corporation d/b/a Honda Financial Services ("Honda Finance") (collectively, "Honda").

**INTRODUCTION**

Saccucci is an automobile dealership located in Middletown, Rhode Island, owned by Cora Saccucci and her two daughters, Barbara and Carol. Saccucci is one of more than 1,200 Honda and Acura dealers throughout the country (Acura is a premium brand manufactured by Honda). As is common among automobile dealers, Saccucci sells parts and service as well as new and used automobiles. Saccucci also sells products called "vehicle service contracts" ("VSCs"), which are factory-backed protection packages for new and used vehicles that provide certain protection over and above a vehicle's original factory warranty. Honda markets its VSCs under the brand names of "Honda Care" and "Acura Care." As is also common among automobile dealerships, Saccucci's non-vehicle sales, including Honda Care and Acura Care VSCs, comprise a critical portion of its business.

Saccucci has enjoyed a significant level of success marketing Honda and Acura Care VSCs over the internet, a practice that has profited Honda greatly and which Honda has actively encouraged over the years. This case involves Honda's unlawful effort to essentially put an end to Saccucci's VSC sales business by unilaterally rewriting its contract with Saccucci to prohibit internet VSC sales. Honda did so simply by announcing a new policy forbidding internet sales of Honda Care and Acura Care VSCs, including monetary penalties and even the threat of terminating a dealership's right to sell VSCs altogether. The Rhode Island Superior Court (Silverstein, J.) temporarily restrained the implementation of that policy after it found that Saccucci stated a *prima facie* case for violation of multiple sections of R.I. Gen. Laws Ch. 31-

5.1. Honda subsequently removed the case to this Court. Saccucci now seeks a preliminary injunction on the same grounds.

Saccucci and Honda are party to several contracts that govern Saccucci's right to sell VSCs, including a master dealership Sales and Service Agreement, Retail Finance Agreement, Lease Plan Agreement and the Honda Care Dealer Enrollment & Participation Agreement. But as an auto dealership, Saccucci enjoys rights that transcend its contractual relationships with Honda, and Saccucci is protected by Rhode Island law from coercive, arbitrary and unconscionable actions by Honda. Under what is commonly known as the "Automobile Dealers' Day in Court Act," R.I. Gen. Laws Ch. 31-5.1, automobile manufacturers are prohibited from engaging in practices that are injurious either to the dealership or the public at large. Here, Honda's attempt to terminate internet sales is both coercive and arbitrary, and is directly harmful to Saccucci. Moreover, Honda's new policy is designed specifically to prevent dealers like Saccucci from competing against other dealers on the basis of price. If allowed, the prohibition on internet sales inevitably would mean that consumers will pay more, potentially much more, for Honda Care and Acura Care VSCs.

## FACTUAL BACKGROUND

The facts set forth in the Amended Verified Complaint, the previously-filed Affidavits of Barbara Saccucci Radebach and Gardiner Reynolds and to be introduced at the hearing of this motion are summarized below.

### A. Saccucci's VSC Sales

By contract, Honda authorizes its dealers to sell Honda Care and Acura Care brand VSCs. For Saccucci and other dealers, sales of service contracts like VSCs are a significant source of dealer profit. Strong competition among dealers and the increased ability of consumers to research dealers' costs for new vehicles, both of which have been enhanced significantly by

the internet, have greatly reduced profit margins on new vehicle sales. As a result, many new and used vehicle dealers have increasingly relied on add-ons and extras typically sold in the Finance and Insurance Department (commonly called the "F&I Office") as a major source of revenue and profit. VSCs are a typical "extra" sold by dealers to new and used car customers in the F&I Office as a means of increasing the profits on an individual sale.

As their name implies, VSCs are a service contract, but these contracts are not between the dealer that is selling them and the consumer. They are between Honda and the consumer. Honda prepares and administers its VSC program and uses its dealership network as a sales force. As with new cars, Honda does not control the price at which dealers may sell its VSCs. Dealers pay a set price to Honda for each contract (which varies based upon the specific terms of the VSC) and sell them at whatever price they can command. In addition to the profit that dealers can get by increasing the price to customers, Honda has implemented an incentive program, called "Performance-Based Allowance" or PBA, that provides additional compensation to the dealer for each Honda Care or Acura Care VSC sold. The amount of PBA compensation per sale increases, based on the dealer's volume of VSC sales relative to automobile sales. As a result of the PBA program, a dealer may make a profit on a VSC, even if it is sold to the customer at cost. However, dealers remain free to charge anything they can get for the contracts and still receive the PBA from Honda.

Even with the advent of the internet, historically there was relatively little publicly available information regarding the cost of vehicle service contracts. Likewise, little information was available as to the terms of the contracts. Lacking that information, customers at the dealership were not in a position to fully understand the contracts, to assess the dealer's representations about the contracts, or to negotiate effectively in the purchase of a vehicle service contract.

Some time prior to 2005, Saccucci was approached by one of its local Honda Dealer Representatives and encouraged to begin offering genuine Honda Parts and Accessories for sale over the internet as a way to increase the revenues of the dealership, which by virtue of its location on Aquidneck Island has a limited population from which to draw new customers. The Honda Dealer Representative instructed Saccucci on how to build an internet Parts and Accessories business and facilitated Saccucci's investigation and research into some of the other local dealers' online Parts and Accessories businesses. Ultimately, Saccucci successfully entered this business. Once Saccucci's internet Parts and Accessories business was off the ground, Saccucci noticed that some other Honda dealers were also offering Honda Care and Acura Care VSCs for sale over the internet and asked its Honda Finance Dealer Representative about this line of business. The Honda Finance Dealer Representative enthusiastically encouraged Saccucci to expand its business on the internet to include Honda Care and Acura Care VSCs.

Based primarily on the encouragement of its Honda Finance Dealer Representative, Saccucci investigated an internet-based VSC sales business and devoted time, money, energy, personnel and other resources to create and develop an internet Honda Care and Acura Care VSC sales business through the website http://www.myhondawarranty.com. The internet presents several advantages to consumers for VSC purchases. Potential customers can research VSCs, including Honda Care and Acura Care VSCs, and compare both their terms and their prices. Unlike a customer in a brick-and-mortar F&I Office, internet customers have both choices and the time to investigate VSCs before making a purchasing decision. And of course, by selling via the internet, Saccucci reaches customers who would never have stopped by its Middletown location.

Saccucci was very successful in this effort, garnering a significant market share of internet sales of Honda Care and Acura Care VSCs. Honda continued to encourage internet sales

and commended Saccucci for its success. Saccucci, in turn, continued to develop and grow its internet VSC sales business.

**B. Dealer Opposition to Internet Sales and Honda's New Policy**

Some Honda dealers chose not to market Honda Care and Acura Care VSCs over the internet, relying exclusively on in-person sales. For those dealers, the relatively closed atmosphere of the F&I Office allowed them to sell the same VSC products at significantly higher profit margins than Saccucci could command on the open market. Saccucci was, in essence, competing based on price with other Honda dealers well beyond its natural geographic reach, and at least some dealers were not happy with the results. Those dealers complained to Honda that internet sales of Honda Care and Acura Care VSCs were undercutting their own sales in their respective F&I Offices. Through this litigation, Saccucci has learned that one of the largest and most powerful Honda dealers in the country was particularly opposed to sale of VSCs over the internet and worked within Honda's National Dealer Advisory Board to force Honda to take action.

In response, on February 14, 2008, Honda announced its new Honda Care and Acura Care Vehicle Service Contract Internet Policy & Guidelines (the "New Honda Policy"). A copy of the New Honda Policy is attached as Exhibit 1. The New Honda Policy contains a blanket prohibition of internet VSC sales, declaring succinctly that "INTERNET VSC SALES ARE PROHIBITED EFFECTIVE APRIL 1, 2008." The New Honda Policy gave two justifications for this prohibition: (1) that internet selling "undermines" the Honda Care and Acura Care brands as to both dealers and customers, and (2) that internet selling violates dealers' contractual limitation with respect to the locations from which they may sell.

**C. The Irreparable Harm to Saccucci**

The harm to Saccucci from the implementation of the New Honda Policy is enormous. Its impact is obvious: if the policy is enforced, Saccucci will have to cease the operation of its internet Honda Care and Acura Care VSC business. This will irreparably harm Saccucci's business, its reputation, and its goodwill with its customers. Saccucci's market position will be forever diminished as it will be unable to continue to compete meaningfully against other dealerships. The New Honda Policy will result in the elimination of an entire line of business. Moreover, the internet VSC sales business is such an important part of Saccucci's overall business that its elimination may result in the loss or forfeiture of Saccucci's Honda dealership.

Additionally, the New Honda Policy states that Honda "is committed to exploring uses of the internet – including possible future methods of Internet selling of VSCs." Saccucci has spent considerable time, money, and effort at building its internet presence with respect to the sale of Honda Care and Acura Care VSCs, and, as a result, its Saccucci's web page has a high "page ranking" in popular internet search engines. Implementation of the New Honda Policy would effectively require Saccucci to take down its www.myhondawarranty.com website. Taking down the website for any significant length of time would ruin Saccucci's rankings among the popular internet search engines. If and when Honda were to come up with a "future method of Internet selling" of its VSCs, Saccucci would be back to square one and would lose the competitive advantages that it has gained for itself over the past three years.

**D. Impact of the New Honda Policy on the Public**

Internet sales of VSCs have had and will continue to have the laudable effect of allowing consumers interested in purchasing service contracts for their Honda and Acura vehicles to do so in a competitive price atmosphere, without high-pressure sales tactics, and with knowledge of just what it is that they are purchasing. The New Honda Policy would directly harm the

consuming public and undermine the public interest in fair, open and honest competition. Consumers who have purchased Honda Care and Acura Care VSCs over the internet have purchased the same product as customers at dealers' F&I Offices; the only practical difference from the customer's perspective is that the internet price is usually much lower.

## ARGUMENT

The factors to be considered in awarding a preliminary injunction are well settled:

> (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest.

*United States v. Weikert*, 504 F.3d 1, 5 (1st Cir. 2007); *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996); *Westenfelder v. Ferguson*, 998 F. Supp. 146, 150 (D.R.I. 1998). Saccucci satisfies all four elements of this test.

### A. Saccucci Has a Reasonable Likelihood of Success on the Merits

"The first factor, the plaintiff's likelihood of success, is 'the touchstone of the preliminary injunction inquiry.'" *Boston Duck Tours v. Super Duck Tours*, 531 F.3d 1, 11 (1st Cir. 2008) (quoting *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998). Because, as will be shown below, the New Honda Policy would be an unlawful infringement of Saccucci's rights, the factors of irreparable harm, the relative burdens among the parties, and the public interest all weigh entirely in Saccucci's favor and in favor of issuing the requested injunctive relief.

#### 1. Saccucci Is Likely to Prevail on Its Statutory Claim

Rhode Island adopted the Automobile Dealers' Day in Court Act to shield automobile dealers from oppressive business practices by manufacturers. As this Court described the federal and Massachusetts versions of the law, such statutes seek to "level the playing field or regulate

market forces which, if left to their own devices, would lead to consumer harm." *Pride Hyundai, Inc. v. Chrysler Financial Co.*, 263 F. Supp. 2d 374, 397 (D.R.I. 2003). The Rhode Island law, R.I. Gen. Laws § 31-5.1-1 *et seq.*, prohibits a broad array of practices by manufacturers. Section 31-5.1-4(a) provides generally that

> It shall be deemed a violation of this chapter for any manufacturer or motor vehicle dealer to engage in any action which is **arbitrary, in bad faith, or unconscionable and which causes damage to any of the parties involved or to the public**.

(Emphasis added). The remainder of Section 31-5.1-4 sets forth a laundry list of prohibited practices, primarily for manufacturers with respect to automobile dealers, stating in relevant part (emphasis added):

> (b) It shall be deemed a violation of this chapter for a manufacturer, or officer, agent, or other representative of a manufacturer, to coerce, or attempt to coerce, any motor vehicle dealer:
>
> [* * *]
>
> (4) **To enter into any agreement with the manufacturer or to do any other act prejudicial to the new motor vehicle dealer by threatening to terminate or cancel a franchise or any contractual agreement existing between the dealer and the manufacturer**; except that this subdivision is not intended to preclude the manufacturer or distributor from insisting on compliance with the reasonable terms or provisions of the franchise or other contractual agreement, and notice in good faith to any new motor vehicle dealer of the new motor vehicle dealer's violation of those terms or provisions shall not constitute a violation of the chapter.
>
> (5) **To refrain from participation in the management of, investment in, or acquisition of any other line of new motor vehicle or related products**. This subdivision does not apply unless the new motor vehicle dealer maintains a reasonable line of credit for each make or line of new motor vehicle, the new motor vehicle dealer remains in compliance with any reasonable facilities requirements of the manufacturer, and no change is made in the principal management of the new motor vehicle dealer. [* * *]

(c) It shall be deemed a violation of this chapter for a manufacturer, or officer, agent, or other representative:

[* * *]

(2) **To coerce, or attempt to coerce, any motor vehicle dealer to enter into any agreement with the manufacturer, or its officer, agent, or other representative, or to do any other act prejudicial to the dealer, by threatening to cancel any franchise or any contractual agreement existing between the manufacturer and the dealer**. Notice in good faith to any motor vehicle dealer of the dealer's violation of any terms or provisions of the franchise or contractual agreement shall not constitute a violation of this chapter.

[* * *]

(21) **To engage in any predatory practice against a new motor vehicle dealer**.

According to the plain language of the statute, Saccucci may prevail on its statutory claim in a variety of ways. First, it will show that Honda's implementation of the New Policy is coercive because by forcing Saccucci to shut down its internet VSC business Honda is requiring Saccucci to "do [an] act" prejudicial to Saccucci under pain of termination of Saccucci's right to sell VSCs, or in the words of the statute, "by threatening to cancel […] any contractual agreement." R.I. Gen. Laws § 31-5.1-4(b)(4), (c)(2). Saccucci will also show that Honda is *de facto* coercing it to refrain from participating in the Honda VSC program, a "line of new motor vehicle or related products." R.I. Gen. Laws § 31-5.1-4(b)(5). Alternatively, Saccucci will show that the policy is arbitrary and causes damage either to Saccucci or the public. R.I. Gen. Laws § 31-5.1-4(a). Finally, Saccucci will show that the New Honda Policy constitutes a predatory practice against it. R.I. Gen. Laws § 31-5.1-4(c)(21).

Because the New Honda Policy, the penalty provisions set forth by Honda for violations of that policy, and Honda's implementation of that policy fall squarely within the prohibitions of the statute, Saccucci is likely to prevail on this claim.

**a. The New Honda Policy is Coercive.**

It is beyond dispute that, but for the New Honda Policy, Saccucci enjoys a contractual right to sell Honda Care and Acura Care VSCs via the internet as it has done for years. Honda readily acknowledges that, prior to the enactment of its new policy, internet sale of VSCs was "an acceptable practice." Saccucci's contractual right to sell VSCs derives from an express written contract between Saccucci and Honda. It is also beyond dispute that Honda has not attempted to renegotiate or amend its VSC contract with Saccucci to alter the means by which Saccucci is permitted to sell VSCs. Instead, Honda has unilaterally announced a policy that, if effective, would require Saccucci to forego its right to sell Honda VSCs over the internet or face monetary penalties and, for a third violation, would result in "permanent deactivat[ion] from selling [Honda] VSCs", *i.e.* termination of its Honda Dealer Enrollment and Participation Agreement. Exhibit 1 at 10.

This is coercion by the plain language of the statute, which provides that it is unlawful for a manufacturer like Honda to attempt to force a dealer like Saccucci to "enter into any agreement with the manufacturer or to do any other act prejudicial to the new motor vehicle dealer by threatening to terminate or cancel a franchise or any contractual agreement existing between the dealer and the manufacturer." R.I. Gen. Laws § 31-5.1-4(b)(4).[1] Although the Rhode Island statute does not specifically define the term "coerce," other States' versions of the Dealers' Day in Court Act do, and their definitions comport with common understanding of the term. Maryland's statute, for example, defines "coerce" as meaning "to compel or attempt to compel by threat of harm, breach of contract, or other adverse consequences." Md. Code. Ann., Transp. II, § 15-207 (2000). Courts applying the federal Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.*, have applied a similar standard. *See*, *e.g.*, *Wagner and Wagner Auto*

[1] The same prohibition is found in Section 31-5.1-4(c)(2).

*Sales, Inc. v. Land Rover North America, Inc.*, 539 F. Supp. 2d 461, 473 (D. Mass. 2008) (coercion "must include a wrongful demand that would result in penalties or sanctions if not complied with"). Honda's threat of termination of the Saccucci Honda Dealer Enrollment and Participation Agreement is plainly coercive.

Whether the New Honda Policy is construed as a new agreement (because it modifies an existing contract) or simply an act "prejudicial to the [dealer]" (because it eliminates an entire line of Saccucci's business), there can be no question that it is being forced on Saccucci by way of Honda "threatening to terminate or cancel a […] contractual agreement existing between" Honda and Saccucci.[2] If Saccucci sells over the internet, it will be "permanently deactivated" from selling Honda VSCs, *i.e.* its VSC contract with Honda will be terminated or canceled.

Because the New Honda Policy is coercive, its implementation violates R.I. Gen. Laws § 31-5.1-4(b)(4) and (c)(2) and should be enjoined.

**b. The New Honda Policy is Arbitrary.**

Honda recited two justifications for the New Honda Policy: that internet sales were "undermining" the Honda Care and Acura Care brands and that the policy is necessary to "align the policy regarding such sales with that for sales of Honda vehicles from unauthorized locations." Exhibit 1 at 2. Both claims are baseless.

[2] In this instance, the fact that Honda's policy is coercive is determinative of the violation of the Automobile Dealers' Day in Court Act without regard to the precise manner in which the coercive activity is characterized. As noted above, it is also prohibited for a manufacturer to attempt to coerce a dealer in an effort to get him or her to abstain from participating in a "line of new motor vehicle or related products." R.I. Gen. Laws § 31-5.1-4(b)(5). Honda's efforts at restricting the sales methods employed by Saccucci, but not other dealers, amounts to an almost complete termination of Saccucci's Honda Care and Acura Care VSC business. A valid, alternative interpretation of Honda's activities are that they effectively prohibit Saccucci, but not other dealers, from competing in the Honda Care and Acura Care VSC product line in violation of subsection (b)(5).

Honda has no evidence that internet sales have ever had any negative impact on consumer perception of either brand of VSC, nor did it attempt to establish whether there was any actual "undermining" of the brand happening before it launched its new no-internet-sales policy. Significantly, Honda acknowledges that no customers ever complained about online VSC sales – it was only other Honda dealers that complained. The only real impact of internet sales of Honda Care and Acura Care VSCs was that some brick-and-mortar dealerships perceived that they were losing sales of their own heavily marked-up VSCs to their internet-based competition and suffering embarrassment when customers discovered the disparity between their prices and the pricing on the internet. Increased competition is not "brand erosion." Honda is incapable of showing a legitimate connection between internet sales and any diminution in the value of its Honda Care and Acura Care brands. Indeed, Honda cannot even show that there has been any "undermining" of the brand whatsoever. Honda does not control the prices at which Honda VSCs are sold and affirmatively states that "[n]othing in this policy is intended to set, control or regulate the price at which a Dealer may sell [a Honda] VSC." Exhibit 1 at 3. If Honda is to be taken at its word, "undermining" the brands must mean something other than reducing the prices at which Honda VSCs are sold to customers. But Honda cannot show any economic impact from internet sales other than lower price points for consumers.

Honda's second justification is equally specious. The notion that the New Honda Policy was established in order that the VSC-sales policy should be aligned "with that for sales of Honda vehicles from unauthorized locations" (meaning that it should be prohibited from selling from somewhere other than the established dealership) makes no sense and is quite ironic in light of the fact that Honda permits its vehicles to be sold over the internet. It makes no sense because Saccucci (like other dealers offering VSCs over the internet) is not selling from an "unauthorized location." It's selling from its dealership in Middletown, just as it would be if a customer called

them from Providence and ordered a replacement part for a vehicle or a vehicle itself for that matter. Moreover, if Honda believed that selling Honda VSCs via the internet constituted selling from different locations, and that doing so was contrary to Honda's best interest, why did it actively encourage Saccucci to begin selling Honda VSCs on the internet? The answer, of course, is that Honda believed no such things and its "different location" argument is just a pretext ginned up after the fact in an attempt to justify a blatantly anti-competitive policy.

Further evidence of the fact that Honda's justifications are merely a ruse is the fact that, to this day, Honda condones and even encourages sales of its vehicles, parts and accessories over the internet – even on auction sites, such as Ebay. Not only are all the reasons articulated by Honda for banning online VSC sales equally applicable to internet sales of its far more expensive automobiles (and parts and accessories), but those products also have far more impact on Honda's "brand" than VSCs.

The New Honda Policy is arbitrary. If Honda had genuine concerns related to internet sales of its VSCs or the presentation of its Honda Care and Acura Care brands, it could have tailored a policy that ensured that the presentation of information about those brands met its standards – whether delivered in person, by telephone, in print, on radio or television, or on the internet. There also were any number of ways that Honda could have addressed the concerns expressed by its dealers that were unwilling to lower their massive VSC markups to compete with the online sellers. Instead, Honda promulgated a policy that prohibits **only** internet sales and the publication of VSC prices on the internet (but not internet advertisement) and does nothing to curtail any "undermining" of the brands that might occur in person or through other media. Most importantly, it did so without a shred of evidence that its concerns about the brand were well-founded. Certain dealers, apparently unhappy about losing sales to Saccucci,

complained to Honda about the internet competition, and Honda went to their aid at the expense of Saccucci's business. Honda's decision was arbitrary.

Because the New Honda Policy is arbitrary and damaging to both Saccucci and the general public, its implementation violates R.I. Gen. Laws § 31-5.1-4(a) and should be enjoined.

**c. The New Honda Policy is A Predatory Practice**

For the same reasons the New Honda Policy is both coercive and arbitrary, it amounts to a predatory practice in violation of R.I. Gen. Laws § 31-5.1-4(c)(21). *See*, *e.g.*, *In re Jamo*, 283 F.3d 392 (1st Cir. 2002) (predatory practices include coercion and harassment). Indeed, the Supreme Court has declared that behavior that attempts to "exclude rivals on some basis other than efficiency" constitutes predatory activity. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (U.S. 1985). The New Honda Policy is directly anti-efficiency; internet sellers of Honda Care and Acura Care VSCs have proved efficient enough, apparently, to cause certain dealers to complain of lost sales. By adopting the policy, Honda has attempted to exclude those dealers' rivals, including Saccucci, on the basis of the means of selling, not efficiency.

In practical terms, the policy rips the Honda Care and Acura Care VSC business out of the hands of Saccucci for the benefit of other dealerships, who presumably will sell the same products to the same customers for a higher price. In order to placate a few dealerships that complained they were losing business to on-line sellers, Honda decided to make an example of Saccucci, changing the rules of the game in a way that it knew would be fatal to Saccucci's established business practices and even prominently displaying its web pages as examples of precisely what would be prohibited under the New Honda Policy. Honda had no good reason to prohibit internet sales outright, and it fully understood that prohibiting internet sales would catastrophically impact Saccucci. Honda chose that catastrophe for Saccucci.

### 2. Saccucci Is Likely to Prevail on Its Claim for Breach of Implied Duty of Good Faith and Fair Dealing

As parties to an express contract governing VSC sales, both Honda and Saccucci are obliged to fulfill their obligations under that contract in good faith and with fair dealing to the other party. Here, the governing contracts do not contain any restriction on the manner or medium permissible for VSC sales. For Honda to place such restrictions on Saccucci now, unilaterally and without consent or consideration, violates Honda's duty of good faith and fair dealing.

Under Rhode Island law, every contract is imbued with an implied duty of good faith and fair dealing. *Clajayi v. Fafiyebi*, 860 A.2d 680, 687 (R.I. 2004). Rhode Island courts have explained that good faith and fair dealing means:

> that neither party will do anything that will injure the right of the other to receive the benefits of the agreement; the implied covenant imposes upon each party the obligation to do everything that the contract presupposes the party will do to accomplish the contract's purpose. . . . Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed upon common purpose and consistency with the justified expectation of the other party […].

*Apple Valley Mall v. Floyd Realty Co., Inc.*, C.A. No. 97-4157 (R.I. Super. Mar. 30, 1998) (quoting 17A Am.Jur.2d Supp. Contracts § 380 (1997)). Here, Saccucci's right "to receive the benefits of the agreement" means that Saccucci is entitled to continue to perform under the contract just as it has been doing, *i.e.*, by selling VSCs via the internet. Fair dealing requires that Honda recognize that what was lawful under its contract with Saccucci in 2005, 2006, and 2007 must still be lawful[3] and to act on that recognition. The bargain that Honda struck gave Saccucci the right to determine at what price it would sell Honda Care and Acura Care VSCs, how it would market them, and how it would sell them. Honda must live with that bargain and cannot

[3] In fact, at least one Honda dealer has engaged in internet VSC sales since at least 1997.

in good faith change the material terms of the contract without Saccucci's consent.

### 3. In The Alternative, Saccucci Is Likely to Prevail on Its Promissory Estoppel Claim

Even if the Court were somehow to conclude that Saccucci does not have a contractual right to pursue Honda Care and Acura Care VSC sales (a contractual right that would carry with it the implied obligations of good faith and fair dealing, and that would be protected by the Dealers' Day in Court Act as explained above), Honda's ongoing and repeated encouragement and praise of Saccucci's internet VSC sales precludes Honda from implementing the policy and creates an enforceable obligation on Honda's part to permit continued internet sales by Saccucci.

Promissory estoppel creates enforceable contractual obligations where there is "a promise which promisor should reasonably expect to induce action or forbearance[…]." *East Providence Credit Union v. Geremia*, 239 A.2d 725, 727 (R.I. 1968) (citing at Restatement, Contracts, § 90). Courts must enforce such a promise "if injustice can be avoided only by enforcement of the promise." *Id.*; *see also B.M.L. Corp. v. Greater Providence Deposit Corp.*, 495 A.2d 675, 677 (R.I. 1985).

First, by suggesting and encouraging internet VSC sales, Honda made a clear and unambiguous promise to Saccucci: that Honda would permit internet sales of VSCs. Honda not only made that promise, Honda acted on it for a substantial period of time. Honda made this promise in order to induce Saccucci to do precisely as it did, because selling VSCs is good for Honda, just as it is good for Saccucci.

Second, Saccucci reasonably and justifiably relied upon Honda's promise. Saccucci invested time, effort, and money developing, launching, and maintaining its internet presence, developing and deploying the business assets to service the customers who inquired about or purchased VSCs over the internet, and ultimately built its business around such sales. Moreover, Honda was actually aware of Saccucci's actions in this regard, as Honda monitored, commented

on, praised, and encouraged the development of the internet-based business. Honda knew that Saccucci was counting on being able to continue to sell Honda Care and Acura Care VSCs over the internet.

Third, because Saccucci has invested so heavily in developing and deploying the web-based sales model, permitting Honda to escape its promise and prohibit internet-based Honda VSC sales would unquestionably damage Saccucci. That damage satisfies the final prong of the promissory estoppel analysis. Here, because Honda's promises are fully enforceable even in the absence of a written contract, Saccucci is likely to prevail under the doctrine of promissory estoppel as an alternative to its other claims predicated on express contract.

### B. Saccucci Will Suffer Irreparable Harm If The New Honda Policy Is Not Enjoined

Irreparable harm in this instance is apparent. The New Honda Policy would eliminate an entire business segment for Saccucci, a cornerstone of its profitability and, consequently, its continuing business. Such consequences go beyond the mere threshold for a finding of irreparable harm. *See, e.g., Ross-Simons*, 102 F.3d at 18-19 ("plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business"). All that Saccucci must show in this regard is that it will suffer a "substantial injury that is not accurately measurable or adequately compensable by money damages." *Id.* (citing cases). Saccucci's future internet Honda VSC sales, which depend upon a variety of factors including competition, pricing, the success of the Honda and Acura brands themselves, and so forth, cannot be established with precision. The wrongful loss of such business is, as a matter of law, irreparable harm. *Id.*

### C. The Relative Burden Associated with The Requested Injunctive Relief Favors Saccucci

Assessment of the relative burdens among the parties is straightforward. Honda can show no burden from an injunction against implementation of its New Policy. Honda is not

required to do anything more or less than it would be required to do if the New Honda Policy were implemented. Honda will continue to broker the Honda VSCs, using its dealer network as its sales force. Honda will continue to receive its set fees for the various contracts. Saccucci will continue to provide service to Honda and Acura customers. Allowing continued internet sales of Honda Care and Acura Care VSCs, in fact, inures to Honda's monetary benefit, since the competitive pricing of Honda's products should, naturally, tend to increase sales of Honda Care and Acura Care VSCs as against competitive products. Moreover, Honda should not be heard to complain of any negative impact from continuing to allow internet sales since Honda encouraged and rewarded the practice throughout the years.

By contrast, the burden on Saccucci is massive. Implementing the New Honda Policy will force it to choose between suffering the penalties set forth in the New Honda Policy or to abandon its investments in the internet VSC business, potentially realign or even layoff personnel. It is highly unlikely that Saccucci will be able to make up such a considerable amount of lost revenue. VSCs are a very significant portion of Saccucci's revenue stream. Balancing the equities unquestionably favors permitting Saccucci to do what even Honda, until a scant few months ago, believed was a good business plan and consistent with the parties' contractual relationship.

**D. Issuing The Requested Injunction Is in The Public Interest**

Finally, issuing the requested injunctive relief would affirmatively advance the public interest. The public interest is served by the encouragement of free, open, and fair competition consistent with the law. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 300 (1962). Indeed, that is the public policy that forced automobile manufacturers to stop granting exclusive geographic territories to dealerships. *See, e.g., United States v. Arnold, Schwinn & Co.*, 388 U.S. 365 (1967). The New Honda Policy is a direct affront to the public interest as it effectively

isolates individual dealerships from competition outside of their immediate vicinity. Today, a Honda dealer in the Midwest has to take into account the fact that his or her potential customers could purchase a Honda VSC through Saccucci. With the New Honda Policy, that concern would be eliminated. The New Honda Policy is anti-competitive and anti-consumer.

The public's interest in permitting internet sales goes beyond the bottom line price. The public also has an interest in the openness with which these products are sold. Sales that take place in a dealer's F&I Office incident to the sale of a vehicle, by their very nature, can be pressure situations for the consumers, and those customers may also misunderstand the contracts they are purchasing or, worse, in some cases even be deceived by a slick, high-pressure sales presentation.

By selling VSCs on the internet, dealers such as Saccucci give consumers a no-stress, relaxed alternative to the F&I Office. The information that Saccucci presents to potential purchasers is both comprehensive and easily checked and compared to other products. Consumers can educate themselves on the nature of the products being sold and make informed decisions with respect to whether to buy a VSC, what VSC to purchase, and from where. The public benefits directly from the open, accountable competition that internet sellers such as Saccucci bring to the VSC market. Enjoining the New Honda Policy and permitting continued internet sales, would foster vigorous, fair competition on the basis of price, a primary goal of American public policy.

## CONCLUSION

For the foregoing reasons, Saccucci's motion for a preliminary injunction should be granted.

Dated: Providence, Rhode Island
August 19, 2008

Respectfully submitted,

Plaintiff Saccucci Auto Group, Inc.,
by its attorneys,

*/s/ Geoffrey W. Millsom*

Geoffrey W. Millsom, #6483
Jeffrey K. Techentin, #6651
Adam M. Ramos, #7591
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel.: (401) 274-7200
Fax: (401) 751-0604

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Plaintiff Saccucci Auto Group, Inc.'s Memorandum of Law in Support of Its Application for Preliminary Injunction through the ECF system on the 19th day of August, 2008, and that notice will be sent electronically to all counsel who are registered participants identified on the Mailing Information for Case C.A. No. 08-121-S and by regular mail, postage pre-paid, to:

Michael B. Keating, Esq.
David A Kluft, Esq.
Catherine Wicker, Esq.
Foley Hoag, LLP
155 Seaport Blvd
Boston, MA 02210

*/s/ Geoffrey W. Millsom*

*464941_1*