UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SACCUCCI AUTO GROUP, INC., formerly
known as SACCUCCI LINCOLN-MERCURY, INC.,
d/b/a SACCUCCI HONDA,
                 Plaintiff,

v.                                      CA 08-121-ML

AMERICAN HONDA MOTOR COMPANY, INC.,
and AMERICAN HONDA FINANCE CORP., d/b/a
HONDA FINANCIAL SERVICES,
                 Defendants.

MEMORANDUM AND ORDER

      This matter is before the Court on Defendants', American Honda Motor Company Inc.

and American Honda Finance Corp., ("Honda"), motion for summary judgment. Plaintiff,

Saccucci Auto Group, Inc., ("Saccucci"), filed suit against Honda seeking money damages and

seeking to enjoin Honda's adoption and implementation of a policy imposing an Internet sales

ban on a Honda product sold by Saccucci. Saccucci claims that Honda has violated R.I. Gen.

Laws § 31-5.1-4 and breached the implied duty of good faith and fair dealing. Saccucci also

brings a promissory estoppel claim against Honda.[1]

I. Facts
A. The Parties and Vehicle Service Contracts

      Saccucci is a Honda automobile dealership located in Middletown, Rhode Island. Honda,

a California corporation licensed to do business in Rhode Island, is an automobile manufacturer.

---

[1]The Court, after a three day hearing, denied Saccucci's motion for preliminary injunction. See Saccucci
Auto Group, Inc. v. American Honda Motor Co. Inc., C.A. No. 08-121 (D.R.I. Jan. 26, 2009) (Docket # 61).

Honda sells vehicle service contracts through its Honda dealers, under the brand name "Honda Care." A vehicle service contract ("VSC") is a vehicle protection package that supplements a factory warranty. A VSC protects a customer in the event of a mechanical breakdown of a covered component during the term of the VSC. The benefits of a VSC include vehicle repair with genuine factory parts and roadside assistance. Once purchased by the customer, the VSC is a contract between Honda and the customer.

When a Honda dealer sells a Honda Care VSC, the dealer charges the customer for the VSC, pays to Honda the cost of the VSC, and retains whatever is left as profit. Honda does not set the VSC price charged to customers by dealers. Both parties agree that VSCs encourage "service retention," that is, a Honda Care customer is likely to return to a Honda dealer for repairs. At the preliminary injunction hearing, Dan Spafford, ("Spafford"), Honda's Manager of Consumer Assurance Products and Services, testified that Honda Care customers return to a Honda dealer for service over 99% of the time, and to the issuing dealer 65% of the time. Service retention creates customer brand loyalty, meaning that a customer will continue to purchase additional Honda vehicles in the future. Honda seeks to secure customer satisfaction and loyalty in the Honda brand through the sale of Honda-Care VSCs. Barbara Saccucci Radebach ("Radebach"), one of the owners of Saccucci, testified that if "you can keep [customers] coming back for oil changes and having their service work done with you, then, hopefully, you've gained a customer for life." August 25, 2008, Preliminary Injunction Hearing Transcript ("Transcript I") at 31.

The market for VSCs includes not only Honda Care but also VSCs offered by several other providers. Radebach testified that Honda does not "push" dealers to sell Honda Care VSCs

and that Honda permits dealers to sell competitors' VSCs. Id. at 134.

## B.  Honda's Dealer Contracts

The parties agree that the primary document that governs their relationship at the time

pertinent to this litigation is the Automotive Dealer Sales and Service Agreement executed by the

parties in 2003 ("2003 Dealer Agreement").  The 2003 Dealer Agreement grants Saccucci the

"non-exclusive right to sell and service Honda Products at the Authorized Location."  2003

Dealer Agreement at 1.  "Honda Products" include VSCs.  The 2003 Dealer Agreement

specifically provides that it is

> the obligation of Dealer to effectively promote and sell, at retail to the end user,
> Honda Products (with the exception of Honda-authorized service contracts, as set
> forth below) . . . .  Dealer shall offer Honda-authorized service contracts for sale
> to customers, such that they are available for purchase upon a customer's request.

2003 Dealer Agreement at Article 12.1 (emphasis added); Preliminary Injunction Hearing

Plaintiff's Exhibit 1.  A dealer who participates in the Honda Care program agrees to service

vehicles protected by Honda Care VSCs in return for payment from Honda.  Saccucci executed a

Honda Care Dealer Enrollment and Participation Agreement in 1995 ("1995 VSC Agreement").

## C.  The Sale of VSCs

The traditional sales scenario for a VSC involves a local customer at the "brick and

mortar" dealership who has decided to purchase a vehicle and is introduced to the VSC by an on-

site employee of the dealership's Finance and Insurance Office.  Honda offers its dealers a

financial incentive, known as the Performance Based Allowance ("PBA"), to encourage Honda

dealers to sell Honda Care VSCs instead of a competitors' VSC.  The PBA program is an

incentive system based on quotient, or percentage, of VSCs sold as compared to new vehicles

sold by the dealership. The amount of incentive that may be earned by each dealer increases with the number of VSCs sold.

### D. Internet Sales of VSCs and Dealer Complaints

Spafford testified that as of October 2008, approximately 12 dealers were selling Honda Care VSCs over the Internet. Prior to 2007, Honda had received complaints from dealers about Internet sales of VSCs. At that time, however, Honda understood the complaints to be from traditional dealers who were concerned about losing potential VSC sales or being undersold on VSC sales. Prior to 2007, a Honda employee authored an internal-Honda e-mail that described the Internet sales of Honda Care VSCs as an "acceptable practice" which Honda admits "accurately described the state of affairs" at that time. Honda's Response to Plaintiff's Statement of Undisputed Facts at ¶ 27. In fact, prior to 2007, Spafford testified that it was his reaction to inform the dealers who were upset about Internet sales of VSCs to "get on line and compete . . . ." October 31, 2008, Preliminary Injunction Hearing Transcript ("Transcript III") at 62. Honda acknowledged, however, that as sales over the Internet developed, Honda was "going to learn more." Preliminary Injunction Hearing Plaintiff's Exhibit 28.

In late 2007, a Honda dealer in Illinois advised Honda that a long-time customer had purchased a Honda vehicle and a Honda Care VSC from the dealership. The customer had purchased five vehicles from the dealer in the past. The Illinois dealer informed Honda that, after the purchase, the customer discovered a Honda Care VSC for sale on the Internet at a much lower price. The dealer told Honda that the customer returned to the dealership, called the dealer a "thief" and informed the dealer that he would never return to the dealership and would never buy another Honda again because "Honda condones [the] behavior." Transcript III at 43-44.

Spafford testified that the dealer no longer markets Honda Care VSCs and instead offers a competitor's VSC. In 2007 and 2008 Honda received similar complaints from dealers regarding the Internet sales of Honda Care VSCs. One such dealer informed Spafford that the dealership was "losing customers" and the dealership's "reputation around town was in danger" and that the dealership "would consider going to another provider." Transcript III at 45. Spafford testified that, prior to his conversation with the Illinois dealer, he knew that there was a problem associated with the Internet sales of Honda Care VSCs but he did not "really understand the problem." Id. at 46. After the conversation with the Illinois dealer, Spafford realized that Honda had a problem which endangered the Honda brand and customer loyalty.

E. The Development of Honda's Internet Sales VSC Policy

The 2003 Dealer Agreement provides that Honda shall consult with a "representative group of Dealers, as is reasonably practicable" about policy changes. 2003 Dealer Agreement at Article 1. Honda's Dealer Advisory Board ("DAB") is comprised of Honda dealers who are elected to the DAB by other dealers. Local dealers elect district representatives, who in turn elect zone representatives, who in turn represent their geographic zone at national DAB meetings. The zone representatives serve with Honda employees on national subcommittees dedicated to specific areas of business. The DAB makes recommendations to Honda and Honda publishes a newsletter called "Dealer Direct" which includes a description of each recommendation and Honda's response. In January 2007, the DAB advised Honda that the impact on customer satisfaction of the Internet sales of Honda Care VSCs was a "priority" concern. Preliminary Injunction Hearing Defendants' Exhibit AR at 20. The DAB continued to discuss the issue in subcommittee meetings throughout 2007. The 2008 Dealer Direct noted that the issue of Internet

sale of VSCs was at that time a "secondary" concern, meaning that Honda had undertaken steps to address the problem.  Preliminary Injunction Hearing Plaintiff's Exhibit 45 at 34.

Those steps began in the Fall of 2007 when Honda created a committee, consisting of Honda management, Honda in-house attorneys and private outside attorneys, to address the issues raised by the Internet sales of VSCs.  The committee considered the positives and the negatives associated with the Internet sales of VSCs and considered a variety of solutions.  The committee considered many factors, including the effect of Internet sales of VSCs on the Honda brand and on the traditional geographic expectations of dealers.  The committee also considered that Honda's Power Equipment Division had previously instituted an Internet sales ban in response to a problem concerning Internet sales.  Ultimately, Honda decided to place a temporary ban on Internet sales of Honda Care VSCs while Honda developed a long-term strategy to deal with Internet sales.

On February 14, 2008, Honda issued the Honda Care VSC Internet Policy and Guidelines ("Policy"), which in effect, placed a temporary ban on Honda Care Internet VSC sales effective April 1, 2008.[2]  The Policy explained that the rationale for the temporary ban included the protection of Honda's brand image and the alignment of sales of VSCs with the authorized locations provided in the Dealer Agreement.  The Policy noted that Honda was interested in protecting the "one-to-one" customer sales experience and that Honda believed that the Honda Care VSC product could be most effectively explained to customers in person at the dealership.  Preliminary Injunction Hearing Plaintiff's Exhibit 9 at 3.  The Policy provides that repeated

---

[2]Honda has not implemented the Policy during the pendency of this litigation notwithstanding this Court's denial of Saccucci's motion for a preliminary injunction.

6

violations may lead to a prohibition by Honda of the dealer's right to sell Honda Care VSCs.

The Policy states that Honda is committed to exploring uses of the Internet, "including possible

future methods of selling [Honda Care] VSCs – that will not undermine Dealers' sales efforts. . .

." Id. at 2. As an illustration of prohibited text and images, the Policy contains an image of

Saccucci's website. Saccucci's name, however, does not appear on that image.

### F.  Saccucci's Internet Sales of VSCs

In or about 2004, Dan Enderle ("Enderle"), a Honda parts and service representative,

encouraged Gardner Reynolds, ("Reynolds"), Saccucci's Chief Information Officer, to sell

automobile parts over the Internet.  Subsequent to this conversation, Saccucci developed an

Internet site for the sale of automobile parts.  Enderle also informed Reynolds that he believed

other Honda products could be sold over the Internet.  Reynolds testified that Enderle "thought

everything could be online from VSC products to his parts and accessories.  He had a plan to put

everything in the dealership on-line . . . ." Transcript I at 164.  According to Reynolds'

testimony, Enderle told him that if Saccucci sold "it in the dealership, sell it online, and

particularly he pointed out VSCs." October 24, 2008 Preliminary Injunction Hearing Transcript

("Transcript II") at 163.  Reynolds, however, understood that Enderle "was responsible for

[automobile] accessories and parts . . . [and] had nothing to do with the sale of VSCs . . . ." Id. at

118.  Reynolds was aware that other Honda dealers were selling VSCs over the Internet.

Reynolds discussed the Internet sales by other dealers with Bobby Wilkinson ("Wilkinson"), a

representative of American Honda Finance Corporation.  Reynolds testified that Wilkinson

"hinted to me that [selling VSCs over the Internet] was a big business." Transcript I at 171.

Reynolds explained, however, that Wilkinson "wouldn't tell me a lot.  Every time he told me

something about it . . . he didn't want to divulge the other Honda dealer secrets. . . [he] would always say they're doing really well, they're doing these numbers, but you didn't hear that from me." Id. Although Wilkinson did not explicitly ask or tell Reynolds to set up a website for the sale of VSCs, Carol Saccucci, one of the owners of Saccucci, testified that Wilkinson was "very encouraging" and thought that "it would be a great business for" Saccucci. Transcript II at 171. Reynolds also testified that Wilkinson informed him that selling VSCs over the Internet was an "acceptable practice, so [we were] all set, don't worry about anything in the future." Id. at 37.

In early 2006, Saccucci's Honda Care VSC website went live. At its website Saccucci sells Honda Care VSCs at or near cost and relies on PBA payments for its revenue. Reynolds testified that Wilkinson "thought it was a very good site" and that he believed Wilkinson was "kind of proud" of Reynolds. Transcript I at 173-74.

It is undisputed that no provision in any agreement between the parties explicitly grants Saccucci the right to sell VSCs over the Internet. In March 2008 Saccucci filed a verified complaint against Honda in which it sought money damages and injunctive relief. As noted above, this Court denied Saccucci's motion for preliminary injunctive relief.

## II. Summary Judgment

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the pertinent evidence is such that a rational factfinder could resolve the issue in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." National Amusements, Inc. v. Town of Dedham, 43 F.3d

731, 735 (1st Cir. 1995).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Id. Once the movant has made the requisite showing, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Continental Casualty Co. v. Canadian Universal Insurance Co., 924 F.2d 370 (1st Cir. 1991). Saccucci has "a steep hill to climb in convincing the court that a record the that court found incapable of establishing Plaintiff['s] probability of success [on a motion for injunctive relief] now entitles Plaintiff[] to judgment as a matter of law." Dialogo, LLC v. Bauza, 467 F. Supp. 2d 115, 125 (D. Mass. 2006).

### III. Analysis
### A. Violation of R.I. Gen. Laws § 31-5.1-4

Saccucci contends that Honda violated a provision of R.I. Gen Laws § 31-5.1 et. seq., titled "Regulation of Business Practices Among Motor Vehicle Manufacturers, Distributors, and Dealers" ("Dealer Act"). Saccucci specifically argues that Honda violated the Dealer Act by arbitrarily enacting a coercive and predatory Policy. See generally R.I. Gen. Laws § 31-5.1-4.

The Dealer Act regulates the relationship between automobile dealers, manufacturers and distributors and applies to any "person who engages directly or indirectly in purposeful contacts within [the] state in connection with the offering or advertising for sale of, or has business dealings with respect to, a motor vehicle. . . ." See R.I. Gen. Laws § 31-5.1-2; see also Fireside Nissan, Inc. v. Fanning, 828 F. Supp. 989 (D.R.I. 1993), aff'd, 30 F.3d 206 (1st Cir. 1994).

9

Generally, the Dealer Act prohibits a manufacturer or motor vehicle dealer from engaging in certain unlawful acts and practices, including but not limited to, certain coercive, arbitrary and/or predatory conduct. See generally R.I. Gen. Laws § 31-5.1-4. Statutory schemes like the Dealer Act were enacted in response to the disparity in bargaining power between an automobile manufacturer and dealer and the fact that dealers are completely dependant upon manufacturers for their supply of automobiles. See generally New Motor Vehicle Board of California v. Orin W. Fox Company, 439 U.S. 96, 100-101 & n.4, n.5 (1978) (noting R.I. Gen. Laws § 31-5.1-4); see also Dunne Leases Cars & Trucks, Inc. v. Kenworth Truck Company, 466 A.2d 1153, 1158 (R.I. 1983) (noting that similar statutory schemes were intended to "rectify grossly disproportionate bargaining power") (internal quotation marks and citation omitted); Fireside Nissan, 828 F. Supp. at 997 (quoting New Motor Vehicle Board, 439 U.S. at 100-101, and noting that the Dealer Act and other similar state statutes were enacted to protect dealers from "perceived abusive and oppressive acts by . . . manufacturers").

Saccucci argues that the plain language of the Dealer Act applies to the Policy. Saccucci points to R.I. Gen. Laws § 31-5.1-8, which provides that the Dealer Act

> shall apply to all written or oral agreements between a manufacturer and a motor
> vehicle dealer including, but not limited to, the franchise offering; the franchise
> agreement; sales of goods, services, or advertising; leases of mortgages of real or
> personal property; promises to pay; security interests; pledges; insurance
> contracts; advertising contracts; construction or installation contracts; servicing
> contracts, and all other agreements in which the manufacturer, wholesaler, or
> distributor has any direct or indirect interest.

R.I. Gen. Laws § 31-5.1-8 (emphasis added); see also R.I. Gen. Laws § 31-5.1-14 (noting that any "practice under a contract" in violation of the Dealer Act is void). Based on its reading of the Dealer Act, and its contention that the Court is obligated to construe statutory language

10

according to its plain meaning, Saccucci concludes that the Dealer Act applies to all contracts, agreements and practices between Honda and Saccucci.

This Court finds that the Dealer Act is not as expansive as Saccucci argues.  Although this Court did not specifically refer to §§ 31-5.1-8 or 31.5.1-14 in its decision on the motion for a preliminary injunction, the Court did note that the Dealer Act contained broad language applying to franchise or other "contractual agreement[s]."  R.I. Gen. Laws § 31-5.1-4(b)(4) & (c)(2); see also Saccucci Auto Group, Inc. v. American Honda Motor Co. Inc., C.A. No. 08-121, slip op. at 8 (D.R.I. Jan. 26, 2009) (Docket # 61).  The Court is well aware of the broad language in the Dealer Act.  The Court also understands its obligation to interpret the language of an unambiguous statute in accordance with its plain and ordinary meaning.  See generally Castelli v. Carcieri, 961 A.2d 277 (R.I. 2008).  Saccucci, however, ignores judicial construction of the Dealer Act and similar statutory schemes in other jurisdictions.  The First Circuit has held that the Dealer Act is aimed specifically at "adhesive agreements . . . ."  Scuncio Motors, Inc. v. Subaru of New England, Inc., 715 F.2d 10, 12 n.1 (1st Cir. 1983); see also Dunne, 466 A.2d at 1158 (similar statutory schemes were intended to "rectify grossly disproportionate bargaining power") (internal quotation marks and citation omitted); Fireside Nissan, 828 F. Supp. at 997 (quoting New Motor Vehicle Board, 439 U.S. at 100-101, and noting that the Dealer Act and other similar state statutes were enacted to protect dealers from "perceived abusive and oppressive acts by . . . manufacturers").

Saccucci argues that the Dealer Act is designed to "level the playing field" and regulate "market forces which, if left to their own devices, would lead to consumer harm."  See Pride Hyundai, Inc. v. Chrysler Financial Co., LLC, 263 F. Supp. 2d 374, 397 n.42 (D.R.I. 2003), aff'd

on other grounds, 369 F.3d 603 (1st Cir. 2004). The subject matter of the Policy and the parties'

contractual relationship vis-a-vis the sale of VSCs is the determinative factor concerning whether

the Dealer Act applies to this situation. This is not a situation where Honda is threatening to

curtail Saccucci's bloodline – its supply of automobiles – a primary consideration of the 2003

Dealer Agreement and the Dealer Act. The 2003 Dealer Agreement does not require Saccucci to

sell Honda Care VSCs. Saccucci is only obligated to offer the Honda Care VSC upon the

customer's request. Saccucci is also free to sell VSCs from third parties. As Saccucci admits,

Honda does not "push [Saccucci] to sell" Honda VSCs. Transcript I at 134. This laissez faire

attitude on behalf of Honda is not the usual consequence of "grossly disproportionate bargaining

power," Dunne, 466 A.2d at 1158 (internal quotation marks and citation omitted), nor is it the

sign of an uneven playing field or a precursor to consumer harm. Pride Hyundai, 263 F. Supp. 2d

at 397 n.42. An adhesive agreement is one that is submitted to another party on a take-it-or-

leave-it basis. Pickering v. American Employers Insurance Co., 282 A.2d 584, 593 n.8 (R.I.

1971). An adhesive agreement involves "little real choice." Couture v. Pawtucket Credit Union,

765 A.2d 831, 838 (R.I. 2001) (Weisberger, C.J., concurring and dissenting). Honda's

bargaining power in the VSC environment is not oppressive or particularly strong. In short, the

VSC agreement between the parties is not the sort of adhesive, abusive or oppressive

arrangement that the Dealer Act seeks to protect. Scuncio, 715 F.2d at 12 n.1; see also New

Motor Vehicle Board, 439 U.S. at 100-101; Dunne, 466 A.2d at 1158; Fireside Nissan, 828 F.

Supp. at 997.[3]   As such, this Court concludes that this dispute is not subject to the protections

---

[3]The Policy places a temporary ban on one manner in which Honda dealers may sell Honda Care VSCs.
The Policy is not an outright ban on Saccucci's right to offer Honda Care VSCs for sale to interested customers.
This is also not indicative of grossly disproportionate or oppressive bargaining power or of an adhesive arrangement.

afforded by the Dealer Act.

However, even if this Court were to agree with Saccucci's reading of the Dealer Act, this Court finds that the Policy does not offend the Act. Saccucci first claims that Honda's Policy is coercive, and as such, it violates R.I. Gen. Laws §§ 31-5.1-4(b)(4), (b)(5),[4] and (c)(2). R.I. Gen. Laws § 31-5.1-4(b)(4) provides, in part, that it is a violation of the Dealer Act for a manufacturer to coerce or attempt to coerce any motor vehicle dealer to "enter into any agreement with the manufacturer or to do any other act prejudicial to the new motor vehicle dealer by threatening to terminate or cancel a franchise or any contractual agreement existing between the dealer and the manufacturer . . . ." R.I. Gen. Laws § 31-5.1-4(b)(4). R.I. Gen. Laws § 31-5.1-4(c)(2) provides, in part, that it is a violation of Rhode Island law for an automobile manufacturer to

> coerce, or attempt to coerce, any motor vehicle dealer to enter into any agreement with the manufacturer, or its officer, agent, or other representative, or to do any other act prejudicial to the dealer, by threatening to cancel any franchise or any contractual agreement existing between the manufacturer and the dealer.

R.I. Gen. Laws § 31-5.1-4(c)(2). In analyzing the Dealer Act, the Rhode Island Supreme Court has defined coercion as "a wrongful demand which will result in sanctions if not complied with." Dunne, 466 A.2d at 1160 (internal quotation marks and citation omitted) (emphasis added).

The starting point in analyzing whether the Policy is a "wrongful demand" is a determination of Honda's and Saccucci's respective rights concerning the Internet sales of Honda

---

[4]In its complaint, Saccucci alleged that the Policy violated R.I. Gen. Laws §§ 31.5-1(b)(4), (b)(5) and (c)(2) because it was coercive. Honda moved for summary judgment on the claims pursuant to §§ (b)(4), (b)(5), and (c)(2). In its objection, however, Saccucci did not argue that the Policy violated § (b)(5). As a result, Saccucci has waived any claim under § (b)(5). Higgins v. New Balance Athletic Shoes, Inc., 194 F.3d 252 (1st Cir. 1999). However, even if Saccucci had not waived its § (b)(5) claim, the claim would still fail as the Court finds that the Policy is not coercive.

Care VSCs.  It is not unusual for a relationship between parties to be governed by multiple

contracts that may overlap in certain subject areas.  Accordingly, a court may be required to look

to more than one contract to determine a party's rights and obligations regarding a particular

subject.  The parties agree that the primary document that governs the relationship at the time

pertinent to this litigation is the 2003 Dealer Agreement.  Honda maintains that the 2003 Dealer

Agreement is the only agreement that the Court need look to in determining the parties' rights

concerning Internet sales of Honda Care VSCs.  Saccucci counters that the 1995 VSC Agreement

also governs the VSC relationship between the parties.

 The Court starts its analysis with the well-settled principal that if a contract is clear and

unambiguous, the meaning of its terms is a question of law for the court.  <u>Irene Realty Corp. v.</u>

<u>Travelers Property Cas. Co. Of America</u>, ____ A.2d ____, 2009 WL 1576517 (R.I. 2009).[5]  To

determine whether a contract is clear and unambiguous, the court reads the contract in its entirety

giving words their plain, ordinary and usual meaning.  <u>Id.</u>  In engaging in this exercise, the court

must "refrain from engaging in mental gymnastics or from stretching the imagination to read

ambiguity . . . where none is present."  <u>Mallane v. Holyoke Mutual Insurance Co. in Salem</u>, 658

A.2d 18, 20 (R.I. 1995).

 Honda argues that the 2003 Dealer Agreement governs the VSC relationship between the

parties because it grants Saccucci the "non-exclusive right to sell and service Honda Products

---

[5]The 2003 Dealer Agreement contains a choice of law provision stating that the agreement is governed by
California law.  2003 Dealer Agreement Article 23.8.  In submissions to this Court, both on the motion for
preliminary injunction and on the motion for summary judgment, neither party pointed the Court to the choice of law
provision and argued that Rhode Island substantive law governed.  At the preliminary injunction stage, the Court
followed the parties' lead and applied Rhode Island law.  A choice of law argument not presented to the District
Court in a motion for summary judgment is waived.  <u>Ortiz v. Gaston County Dyeing Machine Co.</u>, 277 F.3d 594 (1st
Cir. 2002).  Accordingly, this Court looks to Rhode Island law.

[including VSCs] at the Authorized Location." 2003 Dealer Agreement at 1.  Honda admits that

its dealers also enter into VSC agreements "under which . . . the [d]ealer agrees to service

[a]utomobiles protected by Honda Care VSCs in return for payment."  Honda Statement of

Undisputed Facts at ¶ 17.  In spite of this admission, Honda contends that the 2003 Dealer

Agreement supercedes the 1995 VSC Agreement because the 2003 Dealer Agreement

"terminates and supersedes . . . all prior agreements relating to Honda Products[,]" 2003 Dealer

Agreement at Article 23.2, and provides that Saccucci has waived and abandoned "any and all

claims of any kind and nature whatsoever arising from or out of or in connection with any prior

agreement. . . ." Id. at Article 23.3.

Honda argues that the 2003 Dealer Agreement grants Honda the right to control the

manner in which VSCs are marketed.  The 2003 Dealer Agreement provides that

> American Honda and Dealer recognize that it may be <u>necessary for American
> Honda to formulate new or different marketing strategies, directives and Policies
> and Procedures to meet new or changing technology, laws or circumstances</u>.  In
> the operation of Dealer's business <u>and in the sale and promotion of Honda
> Products</u>, in rendering service and in all other activities of the Dealership
> Operations, <u>Dealer will follow all reasonable directives and suggestions, and the
> Policies and Procedures</u>.

2003 Dealer Agreement Article 12.9 (emphasis added).  The 2003 Dealer Agreement also

provides that Saccucci agrees to "discontinue immediately any advertisement or form of

advertising deemed objectionable upon request by" Honda and that Saccucci will "not publish or

otherwise disseminate any advertisement or announcement or use <u>any form or medium of

advertising which is objectionable</u>" to Honda.  Id. at Article 15.2 (emphasis added).  Saccucci

also agreed that it would "promptly discontinue the use of any of the Honda Trademarks, <u>or

change the manner in which any of the Honda Trademarks are used when requested to do so by</u>"

Honda.  Id. at Article 16.2 (emphasis added).  Honda concludes that based upon the unambiguous language of the 2003 Dealer Agreement it has the right to temporarily prohibit Internet sales of Honda Care VSCs.

The plain language of Article 15.2 of the 2003 Dealer Agreement provides that Saccucci agreed not to use any form or medium of advertising that is objectionable to Honda.  Saccucci's Honda Care VSC website is certainly a form or medium of advertising and the record is clear that Honda objected to the website.  Furthermore, Article16.2 of the 2003 Dealer Agreement provides that Saccucci will change the manner in which a Honda Trademark is used when requested to do so by Honda.  It is undisputed that the Saccucci website displayed the Honda Care trade name.[6] The Policy clearly makes a change in the manner in which the Honda Care name is used.  Consequently, it is also clear that if the 2003 Dealer Agreement is the sole document that governs the parties' rights concerning Honda Care VSCs, the 2003 Dealer Agreement grants Honda the right to temporarily prohibit Internet sales of Honda Care VSCs.

In its sur-reply, Saccucci produced a July 2007 addendum to the VSC agreement, purportedly produced by Honda in discovery.  Saccucci Sur-Reply Brief at Exhibit 1.[7]  Although the addendum does not impact the Court's substantive analysis of the issue of Internet sales of Honda Care VSCs, it does call into question the soundness of Honda's argument that the 1995 VSC Agreement was superseded by the 2003 Dealer Agreement.  The addendum specifically directs the dealer to "file this addendum along with your Honda Dealer Enrollment and

---

[6]Reynolds testified that the Honda brochure for the Policy included a picture of a page (screen) from the Saccucci website.  Transcript II at 64-65.  The Saccucci website page pictured in the brochure prominently displays the Honda Care name.  Preliminary Injunction Hearing Plaintiff's Exhibit 9 at 6.

[7]The addendum has a Honda Bates number in the lower left hand corner of the document.

Participation Agreement for future reference." Id. (emphasis added).  It would be illogical for Honda to amend an agreement in 2007 if it had been superseded four years prior and to direct its dealers to file the addendum with the 1995 VSC Agreement for future reference.  In its sur-reply, Saccucci also produced an unexecuted amended 2004 version of a Honda Care VSC Agreement ("2004 VSC Agreement").  Id. at Exhibit 3.  The 2004 VSC Agreement was referred to in a Spafford affidavit submitted by Honda to the Rhode Island Superior Court in opposition to Saccucci's motion for temporary restraining order.  In that affidavit Spafford stated that "[a]ll Honda dealers who sell Honda VSCs execute a 'Honda Care Dealer Enrollment and Participation Agreement,['] a copy of which is appended hereto . . ." Id. at Spafford Affidavit ¶ 3. Additionally, in its memorandum in opposition to the motion for temporary restraining order, Honda stated that Saccucci and Honda "are parties to a pre-existing contract, the 'Honda Care Honda Dealer Enrollment and Participation Agreement' . . . ."  Saccucci Sur-Reply Exhibit 5 at 2-3 (emphasis added).  The record evidence therefore belies Honda's position that the 2003 Dealer Agreement superseded the 1995 VSC Agreement.

Saccucci argues that if it has the "right under the Honda Care VSC Agreement to sell Honda Care VSCs over the [I]nternet, then the proposed Internet VSC Ban violates that right and is 'wrongful' as a result. . . ."  Plaintiff's Objection to Summary Judgment Memorandum at 19. Saccucci concedes, however, that if "Honda [has] the right under the Honda Care VSC Agreement to prohibit the [I]nternet sale of Honda Care VSCs over the Internet, then the ban is not a 'wrongful' demand."  Id. at 20.

Saccucci argues that the 1995 VSC Agreement incorporates by reference several provisions of the superseded 1990 version of the Dealer Agreement.  Saccucci contends that the

1990 Dealer Agreement, the "Automobile Dealer Sales and Service Agreement Standard

Provisions," (1990 Dealer Agreement), was the Dealer Agreement that was in effect when the

parties executed the 1995 VSC Agreement.  Honda does not dispute Saccucci's assertion that the

1990 Dealer Agreement was in effect when the 1995 VSC Agreement was executed or that the

1995 VSC Agreement incorporates by reference certain provisions of the 1990 Dealer

Agreement.  Saccucci concludes that because the 1995 VSC Agreement does not incorporate by

reference the provisions from the 2003 Dealer Agreement upon which Honda relies, the 2003

Dealer Agreement does not grant Honda the power to temporarily prohibit Internet sales of

Honda Care VSCs.

Saccucci contends that the 1995 VSC Agreement grants it the right to sell Honda Care

VSCs.  Saccucci admits, however, that there is no provision in the 1995 VSC Agreement that

"expressly grants Saccucci the right to sell VSCs over the [I]nternet . . ."  Plaintiff's Objection to

Summary Judgment Memorandum at 20 (emphasis added); see also See Saccucci Auto Group,

C.A. No. 08-121, slip op. at 15. Instead, Saccucci argues that because the 1995 VSC Agreement is

silent, it is thus ambiguous as to whether or not Saccucci may sell Honda Care VSCs over the

Internet or whether Honda has the right to forbid Saccucci to sell Honda Care VSCs over the

Internet.  Because of the claimed ambiguity in the written contract, Saccucci urges the Court to

look to the extrinsic evidence of the parties' intent concerning Internet sales of Honda Care VSCs.

The 1995 VSC Agreement is not as silent on the subject of Internet VSC sales as Saccucci

suggests.  The 1995 VSC Agreement provides that Saccucci is enrolled in the Honda Care

Program and that Saccucci "agrees to abide fully at all times with all terms, conditions and

procedures of the Honda Care Program as set forth in this Agreement. . . ."  1995 VSC Agreement

at ¶ 3 (emphasis added); Preliminary Injunction Hearing Plaintiff's Exhibit 4.  Paragraph 13 of the 1995 VSC Agreement provides that:

> [t]he following provisions are incorporated into this Agreement with full force and effect as though stated in full herein: Sections 2.1, 2.3; 2.6-2.9; 3.2-3.4; 3.7, 3.10; 3.11; 5.2; 7.1-7.8; 9.1-9.9; 10.1-10.7.G; and 11.2-11.12 of the Honda Automobile Dealer Sales and Service Agreement 'Standard Provisions'. . . .

1995 VSC Agreement ¶ 13 (emphasis added).  "[I]nstruments referred to in a written contract may be regarded as incorporated by reference and thus may be considered in the construction of the contract."  Stanley Bostitch, Inc v. Regenerative Environment Equipment Co., Inc., 786 A.2d 1063, 1065 (R.I. 2001).  It is undisputed that the 1995 VSC Agreement incorporates by reference certain provisions of the 1990 Dealer Agreement.[8]  Neither party has pointed the Court to any authority that stands for the proposition that a party cannot incorporate by reference certain provisions of a document that has been terminated, superceded or replaced.  Likewise, this Court has not found any such authority.  See generally Pine Terrace Apartments, L.P. v. Windscape LLC, 87 Cal. Rptr. 3d 630 (Cal. Ct. App. 2009) (citing Turney v. Collins, 119 P.2d 954 (Cal. Ct. App. 1941) and noting that there was no reason for holding that a pleading could not incorporate by reference an exhibit or allegation found in another pleading – even though the pleading had been superseded by a later pleading); Dallas Central Appraisal District v. Mission Aire IV, L.P., 279 S.W. 3d 471, 477 (Tx. Ct. App. 2009) (noting that appellees argued that ownership of certain improvements was supported by lease provisions that incorporated by reference an expired agreement).

The Court next turns to the language of the 1995 VSC Agreement.  Paragraph ¶ 11 of the

---

[8]The Court also notes that the unexecuted 2004 VSC Agreement incorporates by reference the same sections of the Honda Automobile Dealer Sales and Service Agreement Standard Provisions.

1995 VSC Agreement provides that Saccucci

> agrees that it will not make reference to the Honda Care Program in radio,
> television or print advertisements without obtaining the prior written consent of
> American Honda.  Dealer agrees that the term 'Honda Care' is the exclusive
> property of American Honda and that Dealer is granted the nonexclusive right and
> license to use and display such term <u>at the Dealership Premises only</u>.  Dealer
> agrees that it will promptly discontinue the use of the term 'Honda Care' <u>or change
> the manner in which such term is used </u>when requested to do so by American
> Honda.

1995 VSC Agreement at ¶ 11 (emphasis added).  The 1995 VSC Agreement provides that the

term "Dealership Premises" has the meaning "assigned to [it] under the Honda Automobile Dealer

Sales and Service Agreement, including the Standard Provisions thereof. . . ."  1995 VSC

Agreement at ¶ 12.  The 1990 Dealer Agreement defines "Dealership Premises" as the "facilities

provided by Dealer at its Dealership Location for the conduct of Dealership Operations as

approved by . . . Honda."  1990 Dealer Agreement § 12.7; Carol Saccucci Affidavit Exhibit 1.

The 1990 Dealer Agreement further defines "Dealership Location" as the "location approved by . .

. Honda for the purpose of conducting Dealership Operations."  <u>Id.</u> at § 12.5.  It is clear that the

term "Dealership Premises" in the 1990 Dealer Agreement refers to the "brick and mortar" facility

in Middletown, Rhode Island.  Thus, the 1995 VSC Agreement provides that Saccucci may only

"use and display" the Honda Care term at the dealership location in Middletown, Rhode Island

and in radio, television, and print advertising only after receiving prior written consent from

Honda.[9]  Saccucci's website, however, obviously displays the term in areas outside of its brick

and mortar dealership. The Court need not tarry with this apparent violation of the 1995 VSC

---

[9]See n.6 above.

Agreement.[10]  More significant to the question of Internet sales of VSCs, Saccucci agreed that it

would "change the manner in which" the term Honda Care is used when requested to do so by

Honda.  1995 VSC Agreement at ¶ 11 (emphasis added).  The Policy certainly changes the

manner in which Honda dealers may use the Honda Care name.  Thus, the provisions of the 1995

VSC Agreement grant Honda the right to temporarily prohibit Internet sales of Honda Care VSCs.

The 1995 VSC Agreement also incorporates by reference sections 2.3 and 5.2 of the 1990

Dealer Agreement.  Id. at ¶ 13.  Section 2.3 provides that Honda has

> the right at any time and from time to time to establish and revise prices and other
> terms . . . for its sales of Honda Products to Dealer.  Revised prices, terms or
> provisions will apply to the sale of any Honda Products as of the effective date of
> the revised prices, terms or provisions, even though a different price or different
> terms may have been in effect at the time such Honda Products were allocated to or
> ordered by Dealer.

1990 Dealer Agreement § 2.3.  This provision clearly and unambiguously gives Honda the right to

temporarily ban the sale of VSCs over the Internet.

The 1995 VSC Agreement also incorporates by reference § 5.2 from the 1990 Dealer

Agreement.  1995 VSC Agreement at ¶ 13.  Section 5.2 provides that Saccucci

> agrees that it will not advertise, promote or trade in Honda Products or the
> servicing thereof in such a manner as to injure or be detrimental to the goodwill
> and reputation of American Honda and the Honda Trademarks.  Dealer further
> agrees that it will not publish or otherwise disseminate any advertisement or
> announcement or use any form or media of advertising which is objectionable to
> American Honda.  Dealer agrees to discontinue immediately any advertisement or
> form of advertising deemed objectionable upon request by American Honda.

1990 Dealer Agreement at § 5.2 (emphasis added).  Once again, the contract language is clear and

---

[10]Spafford testified that Honda dealers "are supposed to get approval in their usage of the Honda Care brand name but don't."  Transcript III at 106.  Spafford also stated that Honda does not do a "good job" in monitoring the use of the Honda Care name and that Honda "may have rules in place but [Honda does not] enforce them."  Id.

unambiguous. Saccucci specifically agreed that it would not publish or disseminate any announcement or use any form or media of advertising that is objectionable to Honda and that it would immediately discontinue any such advertising upon request from Honda. Honda has determined that the manner in which Saccucci is advertising and/or announcing Honda Care, via the Internet, is objectionable. Thus, in imposing a temporary ban on Internet VSC sales, Honda acted consistent with its rights pursuant to §§ 2.3 and 5.2 of the 1990 Dealer Agreement. Because the Policy is consistent with the provisions of the 1995 VSC Agreement, Honda did not make a "wrongful demand" when it sought to exercise its rights under the contract. See generally Dunne, 466 A.2d at 1160. The Policy, therefore, is not coercive under the Dealer Act. Id.

Saccucci next argues that Honda acted arbitrarily in enacting the Policy and thus violated R.I. Gen. Laws § 31-5.1-4(a). R.I. Gen. Laws § 31-5.1-4(a) provides, in part, that a manufacturer may not "engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of the parties involved or to the public." R.I. Gen. Laws § 31-5.1-4(a). Saccucci argues that Honda's decision to ban Internet sales of Honda Care VSCs was arbitrary because Honda failed to investigate the facts before arriving at a decision to implement the Policy. Saccucci also argues that Honda's true motivation in enacting the Policy is a disputed fact and that Honda enacted the Policy to favor some of its dealers over others.

The Dealer Act does not define the term "arbitrary" nor has any Rhode Island court clearly interpreted the term in the statutory scheme. But see Dunne, 466 A.2d at 1156 (appearing to suggest that an action is not arbitrary if it is based on "due cause"); see also Sundlun v. Zoning Board of Review of City of Pawtucket, 145 A. 451 (R.I. 1929) (arbitrary decision is one that has no foundation in reason). "In a situation in which a statute does not define a word, courts often

apply the common meaning as given by a recognized dictionary." <u>Defenders of Animals, Inc. v. Department of Environmental Management</u>, 553 A.2d 541, 543 (R.I. 1989).  An "arbitrary" act is one that is "[d]etermined by chance, whim, or impulse, and not by necessity, reason, or principle[,]" or is "[b]ased on or subject to individual judgment or preference. . . ."  The American Heritage Dictionary of the English Language 91 (4th ed. 2000).  In interpreting similar language in a similar state statute, the First Circuit defined the term arbitrary as "selected at random without reason. . . ." <u>Schott Motorcyle Supply, Inc. v. American Honda</u>, 976 F.2d 58, 63 (1st Cir. 1992) (internal quotation marks and citation omitted); <u>see</u> <u>generally</u> <u>Coady Corp. v. Toyota Motor Distributors Inc.</u>, 361 F.3d 50, 56 (1st Cir. 2004) (a distributor "acting honestly is entitled to latitude in making commercial" decisions, thus in this context, only an egregious decision is an arbitrary one).

Honda's actions in developing the Policy were not determined by whim, impulse nor selected at random without reason.  Honda engaged in a considered effort to analyze and propose a solution to the issues presented by the sale of VSCs over the Internet.  Honda became aware of the issues associated with Internet sales of Honda Care VSCs as a result of complaints it had received from Honda dealers.  In spite of these complaints, however, Saccucci argues that one of Honda's stated reasons for adopting the Policy, to protect its brand name, was pretextual because Honda did not have any evidence that Internet sales of VSCs undermined the Honda brand name in the eyes of dealers or customers.  Saccucci, apparently ignores the evidence that Honda had received complaints from dealers who informed Honda that they were losing sales to disgruntled customers who had found lower-priced VSCs on line after they had purchased a higher-priced VSC at a dealership.  Saccucci also ignores complaints that dealer reputations were being harmed

23

and dealers were threatening to change marketing to a competitor VSC. Saccucci does not

dispute, however, that Honda seeks to secure customer satisfaction and loyalty in the Honda brand

through the sale of Honda Care VSCs. In June 2007, the DAB, a board whose representatives

were selected by dealerships around the country, identified the subject of Internet sales of Honda

VSCs as a priority concern.[11] Both the DAB and Honda contemplated the problem over an

considerable period of time. Honda, in turn, appointed a committee, including Honda

representatives and internal and external legal counsel, to determine a solution to the questions

raised by Internet sales of VSCs. Honda became aware that dealers were facing disgruntled local

customers who placed Honda consumer loyalty and brand-name reputation in jeopardy as a result

of the disparity in the local "face-to-face" price of VSCs as compared to the price over the

Internet. The complaints received by Honda most certainly impact service retention and brand

image.

      Honda did not randomly or arbitrarily invent the Policy. Honda had adopted a similar

---

[11]Saccucci attempts to create a genuine issue of material fact as to whether the Policy was coercive or arbitrary by arguing that the Policy was not fair to, or representative of, the Internet selling dealers. Saccucci argues that the Policy was a direct result of actions of the owner of "the largest and most powerful Honda dealer," a member of the DAB, who Saccucci argues was against Internet VSC sales. Plaintiff' Objection to Summary Judgment Memorandum at 37. To support this allegation, Saccucci points to an internal Honda June 2007 email between Wilkinson and another Honda representative, which states that the DAB had been considering the issue of Internet sales of VSCs for a "few years," but that the issue had been recently "escalated" as a result of the owner of the large Honda dealership joining the DAB. Preliminary Injunction Hearing Plaintiff's Exhibit 20. The email states, however, that the issue was "still in the research stage and the <u>troops are lining up on both sides for the battle.</u>" Id. (emphasis added). Although Wilkinson informed Reynolds that the owner of the large dealership had pressured Honda into implementing the Policy, in his deposition, Wilkinson admitted that that belief was based on rumors. Carol Saccucci Affidavit Exhibit 6 at 69. Saccucci's accusation is no more than a conclusory allegation based upon unsupported speculation. <u>Feliciano de la Cruz v. El Conquistador Resort and Country Club</u>, 218 F.3d 1, 5 (1st Cir. 2000). The record reflects that Honda considered both the positives and the negatives of implementing a temporary Internet sales ban in a manner that considered the impact on its entire dealer network, no matter the size or "power" of the individual dealers or whether individual dealers were selling VSCs over the Internet. It is clear that, because of the number of Honda dealerships in the United States and the myriad of differences among those dealerships, a policy decision made by Honda will likely impact dealers in different manners. There is no genuine issue of material fact in this record to suggest that Honda adopted a discriminatory Policy to purposefully favor one or more dealerships over others and then created pretextual reasons for adopting the Policy.

policy in its Power Equipment Division in response to a problem concerning Internet sales.[12]  The record reflects that the Policy was issued after consultation with Honda dealers and that Honda appropriately analyzed both the positives and the negatives of selling Honda VSCs over the Internet and determined that the negatives outweighed the positives.[13]  Honda ultimately concluded that selling Honda Care VSCs over the Internet could lead to accusations of unfair profit practices resulting in customer distrust and a deterioration of brand loyalty.

The Policy provides that Honda is committed "to exploring uses of the Internet — including possible future methods of Internet selling of . . . [Honda VSCs] — that will not undermine Dealer sales efforts . . . ."  Preliminary Injunction Hearing Plaintiff's Exhibit 9 at 2 (emphasis added).  Spafford testified that it was Honda's goal to develop a long-term solution to the issue and that he viewed the ban as a temporary one.  Spafford explained that the ban was to

---

[12]Saccucci avers that the Internet sales ban instituted by Honda's Power Equipment Division does not ban all Internet sales of power equipment.  While this may be technically correct, it is not material.  The Honda Power Equipment Internet policy provides that as of January 1, 2004, all Internet sales of Honda power equipment were prohibited pending the creation of an Internet website managed by Honda that would enable a customer to purchase equipment from a Honda-authorized eStore.  See Carol Saccucci Affidavit at Exhibit 34.  The policy provides that only authorized eStores would be allowed to sell Honda Power Equipment over the Internet.  Id.  Thus, the policy creates a Honda Power Equipment Division website created and managed by Honda and not one that is developed and operated freely by dealers.  Saccucci's argument is unavailing.

[13]Saccucci does not dispute that Honda considered the "pros and cons" of the Internet sales of VSCs and considered a variety of solutions.  Honda's Statement of Undisputed Facts at ¶ 53.  Honda concluded that the "[n]egatives . . . [f]ar outweigh the positives."  Preliminary Injunction Hearing Plaintiff's Exhibit 29 at 1.  The record reflects that some of the factors that Honda considered included, but were not limited to, (1) the "brand image" crisis, (2) the impact on Internet sales of VSCs on a dealer's expectation of the dealer's usual marketing area, (3) websites advertising the VSC for sale at cost – thus disclosing dealer cost of a VSC to customers – simply to earn the PBA incentive, (4) the adoption of a similar policy in another division, (5) the concern that Internet sales of VSCs were running afoul of state laws in light of the Dealer Agreement's provision that dealers must comply with state law, (5) implications of some of the VSC websites that the site was an official factory site for purchasing Honda Care VSCs, (6) threats from dealers across the country that they would sell inferior competitive VSC products in order to justify a higher cost to the customer of the Honda Care VSC, and (7) whether Internet sales of VSCs would accelerate dealer interest in, or exploration of, non-VSC revenue generating products that Honda was not adequately prepared to address.  Saccucci also admits that Honda recognized that imposing any policy might drive dealers away from marketing the Honda Care product.  These factors alone fly in the face of Saccucci's accusation that Honda failed to investigate the facts before arriving at a decision to temporarily ban Internet sales of Honda Care VSCs.

be in "place for a short period of time. . . ." Transcript III at 88. Reynolds also testified that

Honda indicated that the policy was temporary. A temporary ban on Internet sales of VSCs

allows Honda more time to further study the issue and develop a long-term solution. Honda did

not arbitrarily adopt the Policy.

Saccucci also argues that Honda has violated R.I. Gen. Laws § 31-5.1-4 by adopting a

Policy that results in a "predatory practice against a new motor vehicle dealer." R.I. Gen. Laws §

31-5.1-4(c)(21). The term "predatory" is not defined in the Dealer Act. Scuncio Motors, Inc. v

Subaru of New England, Inc., 555 F. Supp. 1121 (D.R.I. 1982), aff'd, 715 F.2d 10 (1st Cir. 1983),

however, suggests that where a manufacturer acts "in good faith and with good cause" a court

need not address a predatory conduct allegation. Id. at 555 F. Supp. at 1138 n.27. Generally,

"predatory," in the business context, means "given to exploiting or destroying others for one's

own gain." The American Heritage Dictionary at 1382. Predatory conduct "has no legitimate

business justification other than to destroy or damage competition." Great Escape, Inc. v. Union

City Body Co. Inc., 791 F.2d 532, 541 (7th Cir. 1986).

As noted above, the Policy was a result of a considered approach by Honda. Honda had a

legitimate business justification for the Policy – to ensure that the Honda brand was not

undermined and to ensure customer loyalty. In enacting the Policy, Honda acted with good cause

and in a manner that was in the best interest of its dealer network and did not single out Saccucci

for particular or individualized punishment.[14] The Policy does not destroy or damage competition

---

[14]Saccucci's particularized punishment argument is a red herring. Saccucci argues that the Policy was somehow predatory because it "singled out Saccucci for particular and individualized punishment." Plaintiff's Objection to Summary Judgment Memorandum at 38. Saccucci points to the fact that Saccucci's website was prominently displayed in the Policy as an example of prohibited Internet activity. It is undisputed, however, that Saccucci's name did not appear on the example of prohibited activity. Saccucci also argues that Honda targeted it by eliminating Saccucci's ability to offer payment plans to its VSC customers. Saccucci argues that Honda had an

– it merely resets competition, at least for a time, to occur within standard geographical areas. The Court concludes that the Policy was not predatory. See generally Schott, 976 F.2d at 64 ( a "party does not act in bad faith if there is a valid business reason for its action").

### B.  Promissory Estoppel

Saccucci contends that Honda "promised" that it "had the right to sell VSCs over the Internet" and that Saccucci "would realize a financial benefit it if invested in the means for pursuing such sales."  Amended Complaint at ¶ 34.  Saccucci claims that Honda promised "that if [Saccucci] buil[t] a VSC website, Honda [would] allow [Saccucci] to operate that website and to profit from the website." Plaintiff's Objection to Summary Judgment Memorandum at 45.  In order to succeed on its claim of promissory estoppel Saccucci must show a "1. [a] clear and unambiguous promise; 2. [r]easonable and justifiable reliance upon the promise; and 3. [d]etriment to the promisee, caused by his or her reliance on the promise." Fillippi v. Fillippi, 818 A.2d 608, 626 (R.I. 2003) (emphasis added).

In an effort to show that Honda made a clear and unambiguous promise, Saccucci points to comments made by two representatives of Honda: Enderle, a Honda parts and service representative and Wilkinson, an American Honda Finance representative.  Saccucci avers that Enderle "encouraged" Saccucci to put "everything . . . on line" and Wilkinson "hinted" that selling VSCs over the Internet was "big business." Plaintiff's Objection to Summary Judgment Memorandum at 43-44.  Saccucci submits that Enderle informed Reynolds that if Saccucci sold

---

arrangement with Service Payment Plan ("SPP") through which SPP had an exclusive right to offer payment plans for VSCs.  Saccucci contends that SPP informed Saccucci that it had to remove the administrative fee it charged or forego offering its customers a payment plan option.   It is undisputed, however, that Honda does not direct SPP's communications with Honda dealers.

"it in the dealership, sell it online, and particularly he pointed out VSCs." Transcript II at 163.

Reynolds understood, however, that Enderle was responsible for Honda accessories and parts and

that he had nothing to do with the sale of VSCs. Reynolds testified that Wilkinson "wouldn't tell

[him] a lot." Transcript I at 171. Saccucci also points to daily contact with Wilkinson during the

time period that Reynolds was developing the website. According to Reynolds, Wilkinson saw

draft versions of the website and "thought it was a very good site." Id. at 173. Saccucci also

argues that support for Honda's alleged clear and unambiguous promise is found in Reynolds'

belief that Wilkinson was "kind of proud" of him for developing the website. Id. at 173-174.

Saccucci also contends that Honda was aware that other dealers were selling VSCs over the

Internet and did not stop them.

     "The terms of the promise must be <u>certain</u>, for there can be no promissory estoppel

without a real promise." <u>B.M.L. Corporation v. Greater Providence Deposit Corp.</u>, 495 A.2d 675,

677 (R.I. 1985) (emphasis added); <u>see also</u> <u>Norton v. McOsker</u>, 407 F.3d 501, 507 (1st Cir. 2005)

(plaintiff must establish a "clear, unambiguous and unconditional promise, the terms of which are

certain"). Saccucci's evidence on this point, taken in the light most favorable to Saccucci falls far

short of showing a clear and unambiguous promise. The alleged promise was certainly not clear

enough to apprise Saccucci of the terms of the deal. <u>See</u> <u>B.M.L. Corp.</u>, 495 A.2d at 677; <u>see also</u>

<u>Dellagrotta v. Dellagrotta</u>, 873 A.2d 101 (R.I. 2005) (promise was not clear and unambiguous as it

did not contain a time frame); <u>see generally</u> <u>McKenney v. Structural Fibers Inc.</u>, No. 89-L-14-018,

1989 WL 85679 at * 5 (Ohio Ct. App. July 28, 1989) (it is unreasonable to assume promise of

infinite duration). Saccucci's promissory estoppel claim fails as a matter of law.

## C. Breach of the Implied Duty of Good Faith and Fair Dealing

Saccucci next claims that the Policy breaches the implied duty of good faith and fair dealing. Saccucci contends that there is sufficient evidence for a factfinder to conclude that Honda's representations about performance of the 1995 VSC Agreement establish that Saccucci had the "right" under the contract to sell VSCs over the Internet. Plaintiffs Objection to Summary Judgment Memorandum at 41. Saccuci contends that the covenant of good faith and fair dealing forbids a party from materially and adversely impacting an existing contract's value to the other party. Saccucci argues that the proposed Internet sales ban deprives Saccucci "of its contractual right to sell Honda Care VSCs over the [I]nternet . . . and [that deprivation] will adversely impact the value" of the 1995 VSC Agreement to Saccucci. Id. at 43.

"[V]irtually every contract contains an implied covenant of good faith and fair dealing between the parties." Dovenmuehle Mortgage, Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002) (internal quotation marks and citation omitted). The covenant exists between the parties to a contract to ensure that contractual objectives are achieved. Ide Farm & Stable, Inc. v. Cardi, 297 A.2d 643 (R.I. 1972). "The implication of the duty is that the parties will act in a manner consistent with the purposes of the contract." Lifespan/Physicians Prof. Svs. Org., Inc. v. Combined Insurance Company of America, 345 F. Supp. 2d 214, 225 (D.R.I. 2004). "Under Rhode Island law, the standard for determining whether a party has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct." Pride Hyundai, 263 F. Supp. 2d at 394.

As noted above, Honda has the contractual right to temporarily prohibit Internet sales of VSCs. Saccucci does not have a "right" to sell Honda Care VSCs over the Internet and thus no

29

contractual objectives have been denied to Saccucci.  Consequently, Honda has not breached the implied duty of good faith and fair dealing.  Ide Farm & Stable, Inc., 297 A.2d 643.

Saccucci also argues, however, that "even if there had been some contractual provision that limited Saccucci's right to sell VSCs on the [I]nternet, Honda's subsequent positive encouragement of [I]nternet VSC sales would have waived that right or Honda would be estopped from enforcing that right."  Plaintiff's Objection to Summary Judgment Memorandum at 42 n.12.  The Court has reviewed the authorities cited by Saccucci in support of its position and finds the cases to be readily distinguishable and inapposite.  Saccucci's waiver and estoppel argument is unavailing.[15]

### IV.  Conclusion

Based upon the reasons noted above, Honda's motion for summary judgment is GRANTED.


SO ORDERED


Mary M. Lisi
Chief United States District Judge
July **21**, 2009

---

[15]The Court has also considered Saccucci's other arguments not specifically addressed in this memorandum and order and deems them to be without merit.